IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-20079-CIV-HUCK

LIL' JOE WEIN MUSIC, INC., a Florida
Corporation,

              Plaintiff,

vs.

CURTIS JAMES JACKSON, p/k/a 50
CENT, SHADY RECORDS, INC., a New
York Corporation, AFTERMATH
ENTERTAINMENT, INC., a California
Corporation, INTERSCOPE RECORDS,
INC., a Delaware Corporation, UNIVERSAL
MUSIC & VIDEO DISTRIBUTION CORP.,
a California Corporation,

              Defendants.



## DEFENDANTS' NOTICE OF FILING EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Curtis James Jackson, p/k/a 50 Cent, Shady Records, Inc., Interscope Records, a division of UMG Recordings, Inc. (erroneously sued as Interscope Records, Inc.), and Universal Music & Video Distribution. Corp. ("Defendants"), by and through undersigned counsel, hereby give Notice of Filing the attached exhibits in support of Defendant's Motion for Summary Judgment filed herewith.

### Index to Exhibits

1.      Deposition of Joseph Weinberger and Deposition Exhibits 4-7

2.      Report of Tricia Rose, Defendants' Hip Hop Expert

3.      Report of Judith Finell, Plaintiff's Musicologist, re: "*I Like It, I Love It*"

4.      Report of Dr. Ferrara, Defendants' Musicologist, re: "*I Like It, I Love It*" and Exhibits



5.   Copyright registrations for <u>Who's the Man</u>, <u>Wild Style</u> and "Wild Style, Busy Bee at the Amphitheater"

6.   Articles re: <u>Wild Style</u>

7.   Artwork and liner notes to 1997 reissue of <u>Wild Style</u> soundtrack

8.   Declaration of Luther Campbell

9.   Declaration of Curtis James Jackson, p/k/a 50 Cent

10.  Plaintiff's Interrogatory Responses

11.  Deposition Excerpts of Judith Finell

12.  Articles re: <u>Who's the Man</u>

13.  Deposition Excerpts of Dr. Lawrence Ferrara

14.  Declaration of Ed Lover

15.  Report of Dr. Ferrara, Defendants' Musicologist, re: "*It's Your Birthday*" and Exhibits

16.  Usenet posts re: "it's your birthday"

17.  Book excerpts re: "it's your birthday"

18.  Urban Dictionary re: Shawty

19.  Report of Judith Finell, Plaintiff's Musicologist, re: "*It's Your Birthday*"

20.  <u>The New Breed</u> DVD, <u>Who's the Man</u> DVD and <u>Wild Style</u> DVD (in envelope)

RUSSELL J. FRACKMAN, ESQ.
JEFFREY D. GOLDMAN, ESQ.
MITCHELL SILBERBERG & KNUPP, LLP
Trial Counsel for Defendants
Universal and Interscope Records
11377 West Olympic Blvd.
Los Angeles, CA 90064
Telephone: 310-312-2000
Facsimile:  310-312-3100

and

KAREN L. STETSON, ESQ.
Trial Counsel for Defendants
Curtis James Jackson p/k/a 50 Cent and
Shady Records, Inc.
and Local Counsel for Defendants
Universal and Interscope Records
P.O. Box 403023
Miami, Florida 33140
Telephone: 305-532-4845
Facsimile: 305-604-0598

By: _____
       Karen L. Stetson
       Florida Bar No. 742937

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was hand delivered to

Richard Wolfe, Esq., Wolfe & Goldstein, P.A., 100 Southeast 2nd Street, Suite 3300,

Miami, Florida 33131 on this 6th day of September, 2006.

By: _____
       Karen L. Stetson

## Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 06-20079-CIV-HUCK

LIL' JOE WEIN MUSIC, INC.
a Florida corporation,
       Plaintiff,

vs

CURTIS JAMES JUNCTION CITY, p/k/a 50 CENT,
SHADY RECORDS, INC., a New York Corporation,
AFTERMATH ENTERTAINMENT, INC., a California
Corporation, UNIVERSAL MUSIC & VIDEO
DISTRIBUTION CORP, a California Corporation,
       Defendants.

                Wolfe & Goldstein, P.A.
                100 Southeast 2nd Street
                Suite 3300
                Miami, Florida 33131
                Thursday, 12:15 p.m.
                August 17th, 2006

DEPOSITION OF JOE WEINBERGER

        Taken before IRA COHEN, Court Reporter and

Notary Public in and for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed by the

Defendants in the above cause.

## Page 2

APPEARANCES:

  On behalf of the Plaintiff:

RICHARD WOLFE, ESQ.
WOLFE & GOLDSTEIN, P.A.
100 Southeast 2nd Avenue
Suite 3300
Miami, Florida 33131

On behalf of the Defendants:
JEFFREY D. GOLDMAN, ESQ.
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Trial Counsel for Defendants
Universal and Interscope Records.

        AND

KAREN L. STETSON, ESQ.
  and
MEREDITH A. FRANK, ESQ.
P.O. Box 403203
Miami, Florida 33140
Trial Counsel for Defendants
Curtis James Jackson, p/k/a 50 Cent and
Shady Records, Inc.
and Local Counsel for Defendants
Universal and Interscope Records.

## Page 3

| 1 , 2 | 70 |
| 3 | 73 |
| 4 | 76 |
| 5 , 6, 7 | 95 |
| 8 | 134 |
| 9 | 136 |
| 10 | 161 |
| 11 | 166 |

## Page 4

```
 1            P-R-O-C-E-E-D-I-N-G-S
 2            - - - - - -
 3       [Thereupon, the witness was duly sworn.]
 4   Thereupon,
 5            JOE WEINBERGER
 6   being by the undersigned notary public first duly
 7   sworn, was examined and testified as follows:
 8            DIRECT EXAMINATION
 9   BY MR. GOLDMAN:
10   Q   Could you please state your full name?
11   A   Joseph Weinberger.
12   Q   Do you use any other names?
13   A   No.
14   Q   You understand we're under oath --
15   A   Yes.
16   Q   -- and your testimony today has the same
17   importance and solemnity as if you were testifying
18   in court in front of a judge and jury?
19   A   Yes.
20   Q   Have you ever had a deposition take
21   before?
22   A   Yes.
23   Q   How many times?
24   A   A lot.
25   Q   More than ten?
```

Page 5

1    A   Yes.
2    Q   More than twenty?
3    A   Probably.
4    Q   More than thirty?
5    A   Maybe.
6    Q   More than fifty?
7    A   No.
8    Q   So somewhere between twenty and fifty,
9    probably?
10   A   Yes.
11   Q   I'll get into that in a moment.
12       Have you had a chance, obviously, you know
13   and understand the deposition process.
14   A   Yes.
15   Q   And you're also an attorney?
16   A   Yes.
17   Q   Have you ever taken a deposition?
18   A   No.
19   Q   Have you ever defended a witness in a
20   deposition?
21   A   No.
22   Q   But you are somewhat familiar with the
23   deposition process?
24   A   I have seen a lot besides the ones I have
25   participated in.

Page 6

1    Q   Have you had a chance to talk with
2    Mr. Wolfe about today's deposition.
3    A   In general, yes.
4    Q   Well, since you seem familiar, I'm just
5    going to go over the rules briefly.
6        You're going to be asked questions by me
7    and maybe some other attorneys here will be asking
8    you questions.  You'll answer them.  The court
9    reporter will take them down.
10       Then it will be put in a booklet form and
11   you may or may not have the opportunity after the
12   deposition to change any answers that you may give
13   because if you do that adversely affects your
14   credibility but if you do, that's fine.  But it's
15   important to try to give the best, complete and most
16   accurate answers today, do you understand?
17   A   Yes.
18   Q   Are you under the influence of any
19   medication today that would affect your ability to
20   give your best testimony?
21   A   No.
22   Q   Is there any other reason you would not be
23   able to give your best testimony today.
24   Q   What is the nature of your business?
25   A   Besides being an attorney I own a record

Page 7

1    company and a publishing company.
2    Q   Are you a practicing attorney?
3    A   Yes.
4        Well, not actively practicing but I have
5    an active license and have represented other people.
6    Q   In the State of Florida?
7    A   Why don't we start with your educational
8    background.
9        Tell me where you went to law school.
10   Q   The University of Miami School of Law.
11   Q   What year did you graduate?
12   A   1982.
13   Q   What degree did you get?
14   A   J.D.
15   Q   Pardon me?
16   A   J.D.
17   Q   Where did you attend college?
18   A   The Wharton School, University of
19   Pennsylvania.
20   Q   When did you graduate?
21   A   1979.
22   Q   What degree did you get?
23   A   Bachelor of science in economics.
24   Q   Where did you attend high school?
25   A   West Bury, W-e-s-t, Bury, B-u-r-y, High

Page 8

1    School I West Bury New York.
2    Q   Born in New York?
3    A   Yes.
4    Q   Raised in New York?
5    A   Yes.
6    Q   And you've lived in Florida for how long?
7    A   Twenty-eight years.
8    Q   Have you been practicing law continuous
9    since 1982?
10   A   No.
11   Q   During what period of times have you
12   practiced of time have you practiced law?
13   A   During the entire period except for 1983
14   and 1984 I went to NYU and got a masters in tax
15   issues, an LLM in tax issues.
16   Q   Other than that you have practiced
17   continuously?
18   A   Yes.
19   Q   What is the nature of your practice?
20   A   Since graduating estate planning,
21   business, tax, corporate, entertainment.
22   Q   Entertainment?
23   A   Yes.
24   Q   No litigation?
25   A   No, transactional.

1  Q   Have you practiced solely as a sole
2  practitioner or a firm or both?
3  A   When?
4  Q   Whey don't you describe for me the
5  affiliations that you have from 1982 to the present?
6  A   All right. Let me see, let me start from
7  recent and go backwards.
8  Q   Okay.
9  A   From 1995 to the present I owned or am the
10 co-owner of Lil' Joe Records and Lil' Joe Wein
11 Music, Inc., which is a publishing company.
12     In 2000, I'm not sure exactly the year, I
13 formed a P.A. of Joseph Weinberger, P.A.
14 Q   Joseph Weinberger, P.A.?
15 A   Yes.
16 Q   What is a P.A.?
17 A   A professional association.
18 Q   What is a professional association?
19 A   That's what we call it with doctors and
20 lawyers.
21 Q   Like a professional corporation where I'm
22 from, probably?
23 A   Yes.
24     From 1991 through 1994 I was an in-house
25 lawyer for Luke, L-u-k-e Records and Luther

1  Campbell.
2     That's Luther Campbell like the soup.
3     In 1988 until 1990 I was senior associate
4  at a law firm on Brickell Key called Bailey & Hunt.
5  That's B-a-i-l-e-y, Hunt, H-u-n-t.
6     From 1995 -- excuse me, from 1985 sometime
7  into '88 and I don't remember the exact date, I was
8  an associate in a law firm called Fromberg, F-r-o-m-
9  b-e-r-g, Fromberg, Gross, G-r-o-s-s and Shore, S-h-
10 o-r-e and Lewis, L-e-w-i-s and Rogel, R-o-g-e-l and
11 Keren, K-e-r-e-n.
12     Prior to that I was an associate in a law
13 firm called Goldberg, Young & Borksun, which is B-o-
14 r-k-s-u-n in Fort Lauderdale.
15     All the other firms were in Miami.
16 Q   Is that the extent of it?
17 A   Yes.
18 Q   Why did you leave Goldberg, Young and
19 Borksun?
20 A   To work at Fromberg.
21     It was tax boutique firm.
22 Q   Why did you leave Fromberg?
23 A   Because the firm disintegrated.
24 Q   Well, it had six names. Why does that
25 surprise me.

1  A   All the people went their own, they
2  went -- split --
3  Q   We all want our names on the door. Those
4  are a problem.
5  A   Well, those were all the partners there
6  and the only way, you know, when --
7  Q   So then you went to Bailey and Hunt?
8  A   Yes.
9  Q   Just for clarification, you said you were
10 an in-house lawyer at Luke Records and then you said
11 Luther Campbell sort of in-house personal attorney
12 for Luther Campbell?
13 A   Yes.
14 Q   Was Luther Campbell or Luke Records a
15 client of Baily & Hunt?
16 A   They were a client of mine.
17 Q   That was while you were at Bailey & Hunt?
18 A   Yes.
19 Q   When did you first begin representing
20 either Luther Campbell or Luke Records?
21 A   1989.
22 Q   How did you come to obtain them as a
23 client?
24     MR. WOLFE: Let me caution the witness not
25     to disclose any confidentialities.

1     THE WITNESS: I was representing a
2  guardian in an estate, like a guardianship and
3  the woman's husband was Luther Campbell's
4  stockbroker.
5  BY MR. GOLDMAN:
6  Q   And what was the name of the stockbroker,
7  the woman's husband?
8  A   Albert McCauseland.
9  Q   And you knew how he knew Luther Campbell?
10 A   Yes.
11 Q   He introduced you to the Luther Campbell?
12 A   Yes.
13 Q   And without disclosing the attorney/client
14 privilege, what was the nature, the general nature
15 of your representation that you did for Luther
16 Campbell initially?
17 A   I would have to assert the attorney/client
18 privilege.
19 Q   You can not describe for me just like
20 estate planning or was it tax or was it something
21 of, you know, in general terms estate planning, tax
22 planning?
23 A   In general terms estate planning and tax
24 planning, corporate issue.
25 Q   And that was Luther Campbell and Luke

Page 13

1  Records and --
2      A  And various other companies that he owned.
3      Q  That Luther Campbell owned?  Did you
4  actually help with the creation of Luke Records for
5  Luther Campbell?
6      A  No.
7      Q  Was it already in existence?
8      A  Yes.
9      Q  Did you arrange for the creation of any
10 corporations for Luther Campbell?
11     A  Yes.
12     Q  Can you identify those?
13     MR. WOLFE:  I believe that would fall into
14 the privilege.
15     One second, I want to think about it.
16     You can answer.
17     THE WITNESS:  There were various entities
18 that I recommended that get formed and to
19 closely, you know, more closely identify the
20 activities that were taking place that Luther
21 Campbell and his businesses were involved in
22 instead of having all of them --
23     MR. WOLFE:  Stop, he asked you what you
24 recommended and you indicated that.  Now you're
25 disclosing certain things that maybe are

Page 14

1  attorney/client and I'm going to instruct you
2  that you should stop right there and assert the
3  privilege.
4      THE WITNESS:  Okay.
5      MR. GOLDMAN:  Well, actually the question
6  was a little bit different question and I
7  agree.
8      MR. WOLFE:  That's why I allowed him to
9  answer the question but then he ventured.
10 BY MR. GOLDMAN:
11     Q  Just to clarify and maybe cut to chase,
12 that what I'm really asking you ultimately whether
13 any of the corporations you formed for him or
14 corporations that existed this date whether you may
15 still or he may still own or you may own?
16     A  Well, through the Bankruptcy Court I have
17 some of those, yes.
18     Q  That was the purpose of my question and
19 the purpose of my question I would like to know what
20 they are.  I don't think that would involve any
21 privilege.
22     MR. WOLFE:  I'm going to object because I
23 think it was complex question.  You probably
24 could rephrase it and break it down into a
25 little easier.

Page 15

1  BY MR. GOLDMAN:
2      Q  Let's get back to my original question.
3      Did you form any corporations and you
4  already answer that, so what were the name of the
5  corporations you formed for Luther Campbell.
6      A  Okay.  I can do that.
7      Luke's on Miami Beach, Inc.
8      Then there was Paradise on South Beach,
9  Inc., Entertainment Center, Inc., Luke Records Fan
10 Club, Inc., Luther Campbell Charitable Foundation.
11 And there may be others I don't -- it's a way, way
12 long time ago.
13     Q  Were any of the corporations or other
14 entities that you help Luther Campbell form,
15 ultimately entities that were subject to bankruptcy
16 that occurred later?
17     A  In general, yes.
18     Q  So the assets of those companies may in
19 some cases may be assets that you have now come to
20 acquire through bankruptcy?
21     A  Some of them, yes.
22     Q  Could you identify the specific
23 corporations that were subject to bankruptcy from
24 which you ultimately acquired assets?
25     A  From what I remember there were two

Page 16

1  bankruptcies.  There was Luke Records bankruptcy and
2  Luther Campbell bankruptcy.
3      The bankruptcy order lumped all the assets
4  together.  All of his assets and I think a catch-all
5  phrase, a catch-all division.
6      Q  Were both bankruptcies simultaneous?
7      A  Yes, they were before the same judge.
8      Q  What year?
9      A  1995.
10     Q  Did you represent Mr. Campbell or any
11 entities in any bankruptcy?
12     A  No.
13     Q  Did Mr. Wolfe?
14     A  No.
15     Q  Do you know who did?
16     A  Jonathan Winer.  I think also Jay Gamberg,
17 I believe it's G-a-m-b-e-r-g.  I can't remember
18 really, you know, if there was anyone else.
19     There was a lot of lawyers.  He kept on
20 switching lawyers during the bankruptcy.
21     Q  The bankruptcy was filed in 1995?
22     A  Well, there was an involuntary bankruptcy
23 I think filed against Luke Records and it was filed
24 in 1995.  I believe when they filed the response to
25 the involuntary bankruptcy they converted the

Page 17

1  involuntary bankruptcy at the same time they filed
2  the individual bankruptcy.
3      Q   Who filed the involuntary bankruptcy?
4      A   Who filed it, what law firm?
5      A   Was there a particular individual or
6  entity that filed or caused it to be filed?
7      A   There were three unsecured creditors.
8      Q   Who were they?
9      A   Nimbus Manufacturing, ASR Recording
10 Services of California and Ted Stein and his
11 corporate entities whatever they were called.
12     Q   Who is Ted Stein?
13     A   A studio engineer.
14     Q   And who is Nimbus?
15     A   They manufactured CD's.
16     Q   And what was ASR Recording Services of
17 California?
18     A   Manufactured cassettes.
19     Q   So Nimbus manufactured CD's and ASR
20 manufactured cassettes and the engineer had a claim
21 that they were unpaid -- all three of them had
22 claims that they were unpaid monies from Luke
23 Records?
24     A   Right.
25     Q   In 1991, you left Bailey & Hunt and became

Page 18

1  the in-house attorney for Luke Records and Luther
2  Campbell?
3      A   Yes.
4      Q   How did that come about?
5      A   Luther Campbell asked me to work for him,
6  full time.
7      Q   Were there negotiations for that?
8      A   Yes.
9          MR. WOLFE:  I'm going to instruct you not
10 to go any further with that.
11 BY MR. GOLDMAN:
12     Q   Did you have a written employment
13 agreement with Luke Records?
14     A   Yes.
15     Q   Who negotiated the employment agreement on
16 behalf of Luther Campbell?
17         MR. WOLFE:  I'm going to instruct you not
18 to answer to the extent you would know that
19 comes as a result of privileged communications.
20         MR. GOLDMAN:  Well, it takes a negotiation
21 on the other side, how would that be, you know,
22 privileged.
23         MR. WOLFE:  If you know the name of the
24 lawyer you can disclose that.
25         THE WITNESS:  It was a CPA, Darrell

Page 19

1  Sharpton, a CPA.
2  BY MR. GOLDMAN:
3      Q   Was he not a lawyer?
4      A   I don't know if he was a lawyer or not.
5      Q   Darrell Sharpton?
6      A   Yes.
7      Q   Do you know what period of time he worked
8  for Luther Campbell and/or Luke Records as a CPA?
9      A   I don't know.
10     Q   Was it something that you introduced to
11 Luther Campbell?
12     A   No.
13     Q   Was he already working for Luke or Luther
14 Campbell when you began working for him?
15     A   Could you clear up what you mean when -- I
16 worked for Luther Campbell as an attorney or when I
17 went in-house --
18     Q   Let's start from when you first were
19 performing services, was Darrell Sharpton also
20 already a CPA?
21     A   He wasn't Luther Campbell's CPA per se, he
22 was one of different CPAs that Luther Campbell used.
23     Q   So he was already using him when you first
24 began performing services as an outside attorney?
25     A   As an outside -- if he was an attorney?  I

Page 20

1  don't know whether Darrell Sharpton was an attorney
2  or not.
3      Q   I think you misunderstood my question or I
4  misstated it.
5      A   I'm sorry.
6      Q   As of the time that you first began
7  performing services for Luther Campbell, was
8  Mr. Sharpton performing services for him as a CPA?
9      A   Yes.
10     Q   Was that as part of a firm?
11     A   Sharpton & Buson.
12     Q   And you began working for Luther Campbell
13 or Luke Records in 1991, you became technically
14 employed by one or both of them?
15     A   I was employed by him individually and all
16 his entities.
17     Q   And that was pursuant to one single
18 employment agreement?
19     A   Yes.
20     Q   What were the terms of the agreement?
21         MR. WOLFE:  I'm going to instruct you not
22 to answer, it's privileged.
23 BY MR. GOLDMAN:
24     Q   I am going to say for the sake of
25 convenience that every time Mr. Wolfe instructs you

Page 21

1 not to answer a question that you are going to
2 follow his instructions so I don't have to ask you
3 every time are you following his instruction.
4     A   I have hired him as my lawyer and I'll
5 follow his advice.
6     Q   Do you have a title?
7     A   A title?
8     Q   When you were working in-house at Luke
9 Records and for Luther Campbell?
10     A   Yeah, general counsel.
11     Q   Of each of the entities?
12     A   Not per se.
13     Q   In effect?
14     A   Probably.
15     Q   What were the nature of your duties?
16     A   Whatever he asked me to do as I said, you
17 know, I was at his beckon call.
18     Q   At any point were you called upon to
19 recommend or hire litigation counsel for him?
20         MR. WOLFE: One second.
21         I instruct you not to answer, it would be
22 privileged.
23         MR. GOLDMAN:  Are you going to instruct
24 him not to answer questions about the nature of
25 what he did?

Page 22

1         MR. WOLFE: As to the extent, if what he
2 did resulted from privileged communication,
3 then the answer is yes.  But let's take it
4 question by question.
5 BY MR. GOLDMAN:
6     Q   Were you involved in the negotiation of
7 licenses?
8     A   Yes.
9     Q   Would that include both licensing works
10 that Mr. Campbell or Luke Records owned or licensing
11 materials from others to use by Luke Records and
12 Luther Campbell?
13     A   At what period of time.
14     Q   Well, we're talking about 1991 to mid '94.
15     A   During that period of time, yes.
16     Q   What about '98 -- excuse me, what about
17 '88 to '91?
18     A   No.
19     Q   During the time from 1988 to 1991 period
20 what was the nature of duties that you had. were
21 they limited to estate planning and taxation?
22     A   And other transactional issues.
23     Q   Including entertainment licenses?
24     A   I don't remember.
25     Q   From the period of 1991 to 1994 period

Page 23

1 when you were in-house with Luke Records and
2 Mr. Campbell were you involved in the marketing of
3 his records?
4     A   Yes.
5     Q   In what respect?
6     A   There were different functions that
7 I performed during different periods of time.
8     Q   Would you say you performed some functions
9 as a lawyer and other functions simply more as in a
10 business capacity?
11     A   Yes.
12     Q   Let's focus on the business capacity so we
13 avoid any privilege issues.
14         What were the nature of your
15 responsibilities in a business capacity from Luke
16 Records and from Luther Campbell and his entities?
17     A   Sales.
18     Q   Could you be more specific?
19     A   I was the person that dealt with
20 distributors.  You know, to arrange co-op
21 advertising with stores and things of that nature.
22     Q   During that period of time, what was the
23 nature of Mr. Campbell's work, was it specifically
24 records and music and arranging to have it
25 manufactured, put on CD's and cassettes and

Page 24

1 distributed and sold?
2     A   What?
3     Q   Was the nature of his business?
4     A   The nature of his business, yes.
5     Q   How many employees did he have, I assume
6 they may have changed over the time.
7         Can you give me a range if it changed?
8     A   Twenty to fifty.
9     Q   Between 1988 -- or 1991 to 1994, did that
10 range change or was it growing, was it getting
11 smaller?
12     A   Part of the reason I was hired was to
13 contract the business.
14     Q   Make it smaller?
15     A   Yes.
16     Q   He had too many hangers-on?
17     A   That was part of it.
18     Q   So he was disorganized, he wanted somebody
19 to get it into shape?
20         MR. WOLFE: Objection, privilege.
21 BY MR. GOLDMAN:
22     Q   So the number of employees declined
23 between '91 and '94?
24     A   It was more like kind of a "U."
25     Q   It declined and wet up again?

Page 25

1    A    Right.
2    Q    Were you responsible for placing
3    advertisements in newspapers and other publications
4    to advertise the releases by Luke Records?
5    A    Not in the trade magazines, only as far as
6    I dealt with retail stores like co-op advertisement
7    from the distributor level to the retail store level
8    in order to get the retail stores to buy products
9    from the various distributors.
10   Q    Can you describe what co-op is?
11   A    Well, it would be like price positioning,
12   listening posts, tagging commercials, cable
13   commercials and stuff like that.
14   Q    Placing ads in newspapers?
15   A    No.
16   Q    What do you mean by pricing positions?
17   A    Retail stores and from that time and more
18   so today, they would require you to give them money
19   to position a product on an end-cap or top of a
20   display like they do in supermarkets and things like
21   that.
22   Q    From the perspective of a record company,
23   why would you want your product on end-cap or top of
24   a display?
25   A    So foot traffic would buy the product if

Page 26

1    they saw it.
2    Q    So the location of the product in the
3    store would drive sales of the product?
4    A    It would help drive sales.
5    Q    What was the purpose of putting CD's on
6    listening posts in record stores?
7    A    They could hear it.
8    Q    So that would also contribute to sales?
9    A    Yes.
10   Q    Significantly --
11   A    I think so.
12   Q    And the end-caps and the prominent
13   displays in the stores also produces significant
14   sales?
15   A    It helps.
16   Q    You said you also placed commercials on
17   cable TV?
18   A    The distributor would do it.  I would
19   authorize it so Luke Records would be responsible
20   for payment.
21   Q    So you would pay part of that?
22   A    Not me, personally.  I would authorize it.
23   Q    I understand.  The company would pay part
24   of it?
25   A    Yes.

Page 27

1    Q    And that also contributes to sales?
2    A    Yes.
3    Q    How many releases were there by Luke
4    Records during the time you were working there?
5    A    A lot.
6    Q    Can you give me a ballpark number?
7    A    A hundred.
8    Q    At Luke Records, in addition to Luther
9    Campbell's own performances, did Luke Records also
10   have other artists under contract?
11   A    Yes.
12   Q    How many?
13   A    It varied during the time period.
14   Q    Can you give me a range?
15   A    It could be maybe like a dozen.
16   Q    And of the hundred or so -- well, when you
17   say there were a hundred releases, are you talking
18   about full-length CD's or were you also including
19   singles and other type releases?
20   A    Both.
21   Q    How many full-length CD's were released
22   during that period of time?
23   A    Twenty-five.
24   Q    Could you break that down for me as to
25   which artists were featured on these 25 or so CD's?

Page 28

1    A    I don't understand when you say featured.
2    Q    I'm referring to the actual artists on the
3    CD whose name it was marketed for?
4    A    Let's see.  There were four 2-Live Crew
5    albums.
6         There were two H-Town albums, there was
7    one Lorenzo album.  There were four Professor Griff
8    albums.
9         Then there were like a lot of one a kind
10   type thing.
11        There was a Chris Wong Wa album and then
12   there was a group New 2-Live Crew and there was
13   Disco Rick and the Wolf Pack and then there was
14   Poison Clan was four albums.  Then there was -- let
15   me think -- there was an artist, Junior Demos
16   (phonetic).
17        Then there was Trellini, T-r-e-l-l-i-n-i.
18        There are a couple of others, maybe, you
19   know, maybe it was 25, 30.
20        There was also, let me think, I'm trying
21   to remember.  There was Indo G and Lil' Blount.
22        There was also Society.  There were a
23   couple of artists, you know, JDG.  There was Precise
24   and MC.  And then there was Trainere, T-r-a-i-n-
25   e-r-e.

Page 29

1     And then there was a group by the name of
2  G-a-m-e, Game.
3     I can't really remember any more.  There
4  was an artist by the name of Bust Down.  I can't
5  think of anyone else besides those.
6     Q   And you currently own one of the entities,
7  you currently own a record company, correct?
8     A   Yes.
9     Q   Is that record company or does that record
10  company own the master copyrights and master
11  recordings for any or all of the artists that you
12  just mentioned?
13    A   What copyrights?
14    Q   The ones you just mentioned.
15    A   Which companies, the recordings, which
16  copyrights --
17    Q   I'm talking about the sound recording
18  copyrights.
19    A   Yes.
20    Q   All those artists that you just mentioned?
21    A   Except for H-Town.
22    Q   Why is that?
23    A   Well, as part of what I purchased in the
24  bankruptcy, the entity that was the major creditor,
25  Red Distribution or Distributor, wound up with the

Page 30

1  majority of the H-Town copyrights, but not all of
2  them.
3     Q   So you own some of those?
4     A   Some of the ones that, you know, where
5  they were featured artists on other albums that
6  Luther Campbell put out.
7     Q   In the course of answering questions about
8  the entities and you know, these artists that, you
9  mentioned a distribution deal and I think you
10  mentioned Atlantic distribution deal?
11    A   Yes.  The Atlantic Recording Corporation.
12    Q   When was that deal entered into?
13    A   1990.
14    Q   Before you began working for Luke Records
15  as an in-house attorney?
16    A   Yes.
17    Q   Were you involved in the negotiating of
18  that deal while at Bailey & Hunt?
19    A   No.  I was not involved with any
20  negotiations with Atlantic Recording Corporation.
21    Q   And the nature of that deal really I'm
22  sure is a long and complicated agreement but the
23  nature of the deal was in very general terms that
24  Atlantic would Luke Records recordings but would not
25  obtain a copyright interest in them?

Page 31

1     A   Yes.
2     Q   And at that time did Atlantic under it's
3  deal with Luke Records have any copyright interest
4  in Luke Records?
5     A   None whatsoever.
6     Q   Was that commonly what's known as a P & D
7  deal, where they would press the CD's and distribute
8  them?
9     A   Yes.
10    Q   And Atlantic's --
11    A   Yes, and Atlantic would have a logo on
12  them on the product as well as a Luke Record logo.
13    Q   So Atlantic would receive a flat
14  percentage of the revenues from the CD's?
15    A   In addition to paying its expenses, yeah.
16  I think so.  I don't remember the details of that
17  contract.
18    Q   When did that deal run out or terminate
19  for whatever reason?
20    A   In '93.
21    Q   As of '93 or after that deal terminated,
22  did Luke Records obtain any other distribution deal
23  with a major distributor?
24    A   Yes.
25    Q   With whom?

Page 32

1     A   With Red Distribution, I think it was
2  called initially Relativity Entertainment, I forgot
3  the name, it was an abbreviation which they used
4  which was Red.
5     Q   Was Red Distribution affiliated with any
6  major record corporation?
7     A   Yes.
8     Q   Which ones?
9     A   Sony.
10    Q   What were the terms of that deal?
11    A   What do you mean, what were the terms?
12    Q   When did it start, when did it end?
13    A   It started in '94 and ended in 2000, I
14  think it ended, yeah, 2000.
15    Q   So whatever Luke Records' rights were
16  under that contract that was something you also
17  would have obtained in the bankruptcy?
18    A   Yes, that's part of what I obtained.
19    Q   Was that also a P & D deal?
20    A   No.
21    Q   How did it differ from a P & D deal?
22    A   Luke Records and then myself manufactured
23  the product and delivered it to Sony's warehouses.
24    Q   So it was just a D deal?
25    A   A what.

Page 33

1    Q    It was just a D deal but no P?
2    A    Yes.
3    Q    And Red Distribution would take a
4  percentage fee for distributing?
5    A    A fee and then there were various costs in
6  the contract that they took.
7    Q    Who took or who handled the marketing of
8  the records?
9    A    Could you be a little more specific?
10        During what period of time?
11    Q    Let's start out with the deal with
12  Atlantic.
13        Under the Atlantic deal who was
14  responsible for promoting and marketing and
15  advertising the CD's and cassettes that were sold
16  under that arrangement?
17    A    Luke Records.
18    Q    Did Atlantic have any involvement in
19  deciding to what extent to market albums, how much
20  to pay, where to market them, what types of
21  promotions to do?
22    A    In part.
23    Q    The ultimate decision on those issues made
24  by Luke Records, is that correct?
25    A    Yes.

Page 34

1    Q    In consultation with Atlantic?
2    A    Yes.
3    Q    So Luke Records would develop marketing
4  plans for its releases?
5    A    When.
6    Q    Well, starting out with Atlantic.
7    A    Yes.
8    Q    Would that be in writing or would those
9  have been in writing?
10    A    I don't remember.
11    Q    Was there a particular employee who was
12  considered the head of marketing?
13    A    When?
14    Q    At Luke Records.
15    A    When?
16    Q    During the deal with Atlantic.
17    A    Who was that?
18    A    There were two people.
19    Q    Who?
20    A    Joe Kolsky, K-o-l-s-k-y and Debbie
21  Bennett.
22    Q    Were you also involved in marketing?
23    A    When?
24    Q    The same time period?
25    A    No.

Page 35

1    Q    At some point, did you become involved in
2  marketing?
3    A    Yes.
4    Q    When was that?
5    A    After the Atlantic deal terminated.
6    Q    When the Sony deal began?
7    A    Well, there was another deal in between.
8    Q    And with whom was that deal?
9    A    Independent National Distributors.
10    Q    And that was a distributor who was not
11  affiliated with a major recording company?
12    A    It became affiliated with an entity which
13  would be considered a major entity.
14    Q    What entity was that?
15    A    It was Alliance Entertainment.
16    Q    But at the time that Luke Records had the
17  deal with Independent National Distributors, it was
18  not affiliated with a major --
19    A    I'm sorry, can you repeat the question?
20    Q    At the time Luke Records had a deal with
21  Independent National Distributors, Independent
22  National Distributors was not affiliated with a
23  major recording company?
24    A    Yeah, that's correct.
25    Q    Was it considered a "one-stop."

Page 36

1    A    It was considered a major independent
2  distributor.
3    Q    A one-stop wouldn't be a term used to
4  describe what that was?
5    A    That was an entity that was, Independent
6  National Distributors was four regional distributors
7  that became national distributors, it was Sting
8  Distribution Corporation, CRDI of California
9  Recording Records Distributors and Male-Form
10  Distributors and they acquired the assets of
11  Schwartz Brothers.
12    Q    Under what circumstances did the deal
13  between Luke Records and Independent National
14  Distributors terminate?
15    A    It became known that Independent National
16  Distributors was becoming insolvent.
17    Q    So a new deal was made with Red
18  Distributors?
19    A    Yes.
20    Q    And it was after the conclusion of the
21  Atlantic deal that you began your involvement with
22  marketing problems?
23    A    Yes.
24    Q    What was the nature of your initial
25  involvement?

Page 37

1    A    What involvement are asking about?
2    Q    Marketing of CD's, what did you do?
3    A    At what time?
4    Q    The first job you did, the first thing you
5  did --
6    A    My job at Luke Records was constantly
7  evolving.
8    Q    What was the first time that you were
9  called upon to be involved in marketing?
10    A    Well, other than the issues that were, you
11  know, very more involved with prominent lawsuits --
12        MR. WOLFE:  I'm going to instruct you not
13    to answer what you did.  He's asking you when,
14    so tell him when.
15        THE WITNESS: 1991.
16  BY MR. GOLDMAN:
17    Q    What was it you were asked to do?
18        MR. WOLFE:  We're going to assert the
19    privilege, don't answer it.
20  BY MR. GOLDMAN:
21    Q    My question is what he did in marketing,
22  not in the lawsuits --
23    A    He's a lawyer --
24        MS. STETSON:  You are not asking him about
25    that --

Page 38

1        MR. WOLFE:  He's not going into that.
2    He didn't take his hat off.
3        MR. GOLDMAN:  He already testified to the
4    contrary.
5        MR. WOLFE:  I'm instructing him not to
6    answer the question.
7  BY MR. GOLDMAN:
8    Q    Focusing on activities, without going into
9  legal activities, what were the first marketing
10  activities you were involved in?
11    A    Like Mr. Wolfe said, it's privileged.
12        MR. WOLFE:  Just don't disclose what you
13    were asked to do, you know, don't disclose
14    conversations.  You can say generally what you
15    were involved in.
16        THE WITNESS:  Well, there were issues
17    involved with several major lawsuits that were
18    going on in 1991, 1992, 1993.
19  BY MR. GOLDMAN:
20    Q    I don't know if he'll let you answer, but
21  what lawsuits are you referring to?
22        MR. WOLFE:  You can answer.
23        THE WITNESS:  There was the Pretty Woman
24    case, Roy Oribson which was a parody and the
25    Nick Navarro case, the Broward County case.

Page 39

1  BY MR. GOLDMAN:
2    Q    When was the Nick Navarro case?
3    A    There were two cases --
4        MR. WOLFE:  You can answer.
5        THE WITNESS:  The sheriff of Broward
6    County attempted to stop the sale of an album
7    called "As Nasty As They Want To Be" by 2-Live
8    Crew.
9        And Pretty Woman was a copyright
10    infringement case that ultimately went to the
11    Supreme Court, a parody case.
12        Well, both cases when to the Supreme
13    Court.
14  BY MR. GOLDMAN:
15    Q    What were the outcome of the two cases?
16    A    The Nick Navarro case, the Supreme Court
17    denied certiorari and upheld -- well, the appeal,
18    the 11th Circuit Court of Appeals allowed the sale
19    of the album that they were not obscene and the
20    outcome of the Pretty Woman case was that the song
21    was allowed to be or put out as a parody.
22    Q    Were you involved in developing marketing
23    plans for any of the 30 or so albums that you
24    described earlier?
25    A    Yes.

Page 40

1    Q    For all of them, for most of them -- for
2  some of them?
3    A    Some of them.
4    Q    Can you tell me which ones?
5    A    From -- well, forming marketing plans,
6  maybe for all of them.
7    Q    For all of them?
8    A    Yes.  But different aspects of marketing
9  plans.  It changed during the time frame.
10    Q    Were you involved in approving budgets for
11  the marketing of these albums?
12    A    During different time periods I was, yes.
13    Q    Which of these 30 albums, I'm trying to
14  deal with them collectively or else we'll be here,
15  for months if we did them individually, so generally
16  speaking, which were the biggest selling albums?
17    A    Well, the 2-Live Crew albums, the Luke
18  solo albums, the H-Town albums, the Poison Clan
19  albums, the Lorenzo albums.
20    Q    What was the biggest selling album,
21  period?
22        Well, let me rephrase that, I should say,
23  from the time the album was released until today,
24  which of these albums has been the biggest seller?
25    A    As Nasty As They Want To Be.

Page 41

```
 1     Q   Can you estimate the sales of that album?
 2     A   Over two million copies.
 3     Q   And you said that there were four 2-Live
 4  Crew albums?
 5     A   For the time period I was in-house?
 6     Q   Yes.
 7     A   I would guess yes.
 8     Q   What were those four albums?
 9     A   Sports Weekend, Live In Concert, Banned In
10  The USA, The New 2-Live Crew album, I think it was
11  called Back At Your Ass.
12     Q   That's five isn't it, including Nasty As
13  You Want To Be?
14     A   It was released, it was not initially
15  released during that time period.
16     Q   It was released before?
17     A   Yes.
18     Q   Before you began working there?
19     A   Before I began working in-house.
20     Q   It was released what year?
21     A   1989.
22     Q   Was that the first album?
23     A   No.
24     Q   How many 2-Live Drew albums were there
25  before that?
```

Page 42

```
 1     A   Two albums before that.
 2     Q   What were they called?
 3     A   2-Live Is What We Are, and Move Somethin',
 4  that's without at G at the end with an apostrophe.
 5     Q   And As Nasty As they Want To Be Was the
 6  third album?
 7     A   Yes.  The third 2-Live Crew album.
 8     Q   It was the biggest seller?
 9     A   Yes.
10     Q   What was the order of the subsequent
11  albums, what was the next album out.
12     Q   After the Nasty as they want to be album
13  there was Banned In the USA album and then Live In
14  Concert Album and then Sports Weekend Album and then
15  also there was Nasty As They Want To Be Part Two.
16  That was the last album that the four member 2-Live
17  Crew did.
18     Q   Do you know how many units Banned In the
19  USA sold?
20     A   It was certified gold, over 500,000.
21     Q   What about Live In Concert?
22     A   Several hundred thousand.
23     Q   What about Sports Weekend?
24     A   Certified gold.
25     Q   How would you decide how much to spend on
```

Page 43

```
 1  marketing for a particular album?
 2     A   During what period of time.
 3     Q   Did your decision process change --
 4     A   I didn't make --
 5         MR. WOLFE:  Objection to the form.  I
 6     don't think you established that he even did
 7     that.
 8         THE WITNESS:  As I said I didn't make
 9     decisions during certain periods of time.
10  BY MR. GOLDMAN:
11     Q   During what period of time did you make
12  decisions?
13     A   I never made decisions during any of the
14  periods of time.
15     Q   Well, the question was were you involved
16  in decision making process?
17     A   Yes.
18     Q   All right.  With that clarification in
19  mind what factors went into the decision making
20  process of how much to spend on marketing for a CD?
21     A   During the Atlantic period, during the
22  Atlantic contract, there were discussions with
23  people at Atlantic.
24         Then after that period of time there were
25  discussions amongst myself, Luther Campbell and
```

Page 44

```
 1  distributors whether it was Independent National
 2  Distributors or Red Distribution.
 3     Q   What would be the factor that would be
 4  considered in each particular release?
 5     A   The dialogue between the various people.
 6     Q   Let me ask you this.  For example, would
 7  you consider how well known the artist on the CD
 8  was?
 9     A   Yes.
10     Q   And if an artist was well known, then you
11  would assume that there was already a built-in
12  audience that would be interested in the CD as
13  opposed to an artist that is unknown, correct?
14     A   Not necessarily.
15     Q   The fact that an artist is well known
16  would affect your decision making or on how much you
17  would spend in marketing, in what way?
18     A   As to the types of marketing.
19     Q   If an artist was well known, how would
20  that change your analysis of what type of marketing
21  to do?
22     A   The extent.
23     Q   The extent?
24     A   How much you spend.
25     Q   Well, would you spend more with a well
```

1 known artist or less.
2     A   It depends.
3     Q   On what?
4     A   It depends on what was going on with the
5 particular album at the time.
6     Q   Would you agree that if an artist already
7 has notoriety that that helps the artist sell
8 records.
9     A   Sometimes it actually hurts in selling
10 records.
11     Q   In what situation would it hurt to sell
12 records?
13     A   Sometimes things become too popularized
14 where it is no longer effective.
15         You know, in the sale of records having
16 that amount of popularity.
17     Q   Do you mean or are you suggesting that in
18 the rap industry, if an artist is too popular and
19 you know, say to the mainstream then the rap fans
20 may lose interest in the artist and they want to
21 have more streets credibility?
22     A   Yes.
23     Q   And if an artist has tremendous street
24 credibility but doesn't necessarily sell a lot of
25 records he may be more effective in selling than

1 some who have a lot of success in selling records?
2     A   Yes, in the avenues you mentioned but --
3     Q   Let me ask you this. Is it important for
4 a rap musician or artist to have street credibility?
5     MR. WOLFE:  Object to the form.
6     THE WITNESS:  There are artists that
7         become, you know, street artists that become
8         mainstream and then things change as to how you
9         would market the product once that happens.
10 BY MR. GOLDMAN:
11     Q   Is street marketing common in the rap
12 music industry?
13     A   Yes, it is today.
14     Q   By today, you mean what time period?
15     A   Today, 2006.
16     Q   What about in 2002 or 1998?
17     A   Well, the further back in time you go
18 there were only certain people that were actually
19 going to do street marketing.
20     Q   So it's more common now than it was
21 before?
22     A   A lot more common than before.
23     Q   So has it shown over the last several
24 years that it is an effective way of selling
25 records?

1     A   It's because less effective because
2 there's too much of it there.
3     Q   At what point in time would you say it had
4 become less effective?
5     A   Over the last year or so, the last two,
6 three years.
7     Q   When would you say the peak of its
8 effectiveness was?
9     A   I guess the peak of its effectiveness was
10 when the majors got heavily involved in doing rap
11 and as the majors became more and more heavily
12 involved the amount of money spent on records sky
13 rocketed.
14     Q   And the amount of money that was spent on
15 records would often have a correlation on how the
16 record would be sold?
17     A   No.
18         Sometimes?
19     A   Sometimes, yes.
20     Q   And other times records could sell without
21 a lot of money being spent?
22     A   Yes.
23     Q   And other times a lot of money being spent
24 does not mean a lot of records will be sold?
25     A   No.

1     Q   It's not an exact science?
2     A   Not at all.
3     Q   Is there any correlation?
4     A   Yes.
5     Q   When you were making decisions for the
6 company, Luke Records or Luke Records was making
7 decisions on how to market records, if you expected
8 a release to be successful, to sell a lot of copies
9 that would often influence you to spend more money
10 in marketing?
11     A   Depending upon the particular record.
12     Q   How would it depend on a particular
13 record?
14     A   There were certain records that needed
15 more of a jump-start than others.
16     Q   By more of a jump-start you mean what?
17     A   More money being spent.
18     Q   And were there other records that had
19 existing customer bases or an existing buzz that
20 would cause you to sell a lot of records upfront
21 without a lot of money being spent?
22     A   Yeah, right.
23     Q   How could you tell what records had a lot
24 of street buzz about it before it was released?
25     A   There was a lot of feed back from record

Page 49

1  pool mix deejays, from people that you actually have
2  doing street marketing. There's like an awareness
3  at the retail level that because people are asking
4  for the record and things like that.
5     Q   So it's usually based on conversations
6  with people that you had in the industry?
7     A   Yes.
8     Q   And you would get an overall sense that
9  the album was going to be big?
10    A   Yes.
11    Q   Do you know what mixed tapes are?
12    A   Mixed tapes, yes.
13    Q   What are mixed tapes?
14    A   Mixed tapes are songs that people put out,
15 you know, some of them I guess are usually condoned
16 by the majors now to market records but they're like
17 something like a popular deejay will take a
18 different artist and put, you know, or make sort of
19 like a compilation of albums and put them out on the
20 street to sell it on the streets.
21    Q   Are those considered effective marketing
22 tools?
23    A   They are now.
24    Q   That is part of the street marketing that
25 we had talked about earlier?

Page 50

1     A   Now, not then.
2     Q   Not in 1990?
3     A   Right.
4     Q   More in the last few years?
5     A   More in the last two or three years.
6     Q   Do you know how that was developed?
7     A   In New York.
8     Q   What do you mean?
9     A   Well, it was sold in New York by street
10 vendors.
11    Q   Illegally?
12    A   Yeah.
13    Q   But they became popular?
14    A   Yes.
15    Q   And people, people who were rock fans and
16 in the know would buy these and that would create
17 buzz for the artist?
18    A   In part.
19    Q   And cause the artist to be popular even
20 though they had initially not sold a lot of records
21 yet?
22    A   In part.
23    Q   What do you mean in part?
24    A   Partially, there were other artists that
25 had feuds with various factions of the different rap

Page 51

1  artists and things like that were either, you know,
2  drug kingpins or something like that, they had
3  feuds.
4     MR. WOLFE:  You know we are so far afield
5  from this case, we're really not into anything
6  that's relevant.
7     I hope you can remember that I'm not
8  feeling well.
9     MR. GOLDMAN:  I understand.
10    MR. WOLFE:  I don't want to be at a point
11 where we're spending three hours talking about
12 the business of the music industry and what
13 kind of music they like and all that, it's very
14 interesting but I'm afraid we need to get to
15 something relevant or I'm going to be home in
16 bed.
17    I told you that I'm not feeling well and
18 I'm doing this because I know that you came
19 down here but I'm trying to do the best I can
20 with you and I told you I'm sick and I just
21 don't want to be stuck here doing --
22    MR. GOLDMAN:  Why don't we take a two-
23 minute break.
24    THE WITNESS:  That's good. I need to go
25 to the bathroom.

Page 52

1     [Thereupon, a short recess was taken.]
2  BY MR. GOLDMAN:
3     Q   All right. When we left off we sort of in
4  the middle of an answer about feuds between various
5  artists and how that affects deals --
6     A   Yes.
7     Q   How does that affect sales?
8     A   Sometimes it affects sales, sometimes it
9  doesn't.
10    You know, sometimes the fact that artists
11 are involved with feuds with other rap artists helps
12 develop a buzz and helps sell items.
13    Q   Are you a song writer?
14    A   No.
15    Q   Have you ever written a song?
16    A   No.
17    Q   Have you ever copyrighted a song that you
18 wrote?
19    A   I've never written a song.
20    Q   Do you play an instrument?
21    A   No, I don't.
22    Q   Do you sing?
23    A   No, I do not.
24    Q   Do you perform anywhere?
25    A   No, I do not.

Page 53

```
 1    Q   Do you play an instrument?
 2    A   No, I don't.  I answered that.
 3    Q   Have you had any musical training?
 4    A   No.
 5        What do you mean by musical training?
 6    Q   Well, take any piano lessons --
 7    A   No.
 8    Q   Have you ever produced any records?
 9    A   No.
10    Q   Have you ever engineered or mixed any
11  records?
12    A   No.
13    Q   Have you done anything on the technical
14  side of recording?
15    A   Other than observe, no.
16    Q   Other than the employment that we have
17  talked about today, have you ever been employed in
18  the music industry?
19    A   No.
20    Q   You never worked for any recording company
21  other than Luke Records?
22    A   I take that back.  I have done some work,
23  consulting work for different people.
24    Q   As an attorney or a person with knowledge
25  of the recording industry?
```

Page 54

```
 1    A   Both.
 2    Q   Separate out the work you have done as an
 3  attorney, because I'm sure counsel will instruct you
 4  not to tell me about that.
 5        But what consulting work have you done?
 6    A   Well, I think -- well, the consulting work
 7  that I did would be for particular people that I did
 8  it, it was as an attorney.  So I would say it was
 9  privileged.
10    Q   What period of time was that?
11    A   Over the last couple of years.
12    Q   So you have a certain level or expertise
13  in the area of marketing and selling records?
14    A   Yes.
15    Q   Are you the sole owner of Lil' Joe Wein
16  Music?
17    A   Yes.
18    Q   Has it ever had any other owners?
19    A   No.
20    Q   Are you the sole owner of Lil' Joe
21  Records, Inc.?
22    A   Yes.
23    Q   Has it ever had any other owners?
24    A   No.
25    Q   They're both corporations?
```

Page 55

```
 1    A   Yes.
 2    Q   They're separate corporations?
 3    A   Right.
 4    Q   Not affiliated with one another?  They're
 5  not a subsidiary, there's no subsidiary relationship
 6  or anything of that nature?
 7    A   They're both Subchapter S corporations.
 8    Q   They're both separate?
 9    A   Yes.
10    Q   Neither one owns stock in the other?
11    A   That's correct.
12    Q   Who is Lil' Joe Wein, is it a person?
13    A   Lil' Joe Wein, no.
14    Q   That's not a nickname of yours?
15    A   No.
16    Q   How did you come up with that name?
17    A   BMI came up with the name.  I tried to
18  form a publishing company and they wouldn't allow me
19  to use the name and they suggested that I use that
20  name.
21    Q   BMI?
22    A   Yeah, they wouldn't let me use --
23    Q   They wouldn't let you use your real name?
24    A   I didn't want to use my real name.  I
25  wanted to use a name Like A Fine Wine and they
```

Page 56

```
 1  wouldn't allow me to use that, it was similar to
 2  someone else's publishing company.
 3    Q   Other than the consulting work that have
 4  done for clients, and your work for Luke Records,
 5  and Lil' Joe records and Lil' Joe Wein Music, Inc.,
 6  you've had no other employment experience in the
 7  music industry?
 8    A   No.
 9    Q   Does Lil' Joe Records release -- or Lil'
10  Joe Records release new material?
11    A   During what time period?
12    Q   Currently.
13    A   What you define as new material?
14    Q   I was making a distinction between
15  compilations of previously released material or
16  previously existing material and new material that
17  is newly recorded or --
18    A   I'm in the process of doing that now.
19        At one time I was doing it I stopped doing
20  it and I did compilations and now I'm in the process
21  of doing new material.
22    Q   Do you have artists that you signed?
23    A   Yes.
24    Q   And when was the prior time you did that?
25    A   '96 to 2000.
```

Page 57

```
 1     Q   In 2000 or between 2000 and the present
 2  you solely released compilations and old material?
 3     A   Yes.
 4     Q   How many albums if you will or CD's has
 5  Lil' Joe Wein Music, Inc. released?
 6     A   Maybe a hundred.
 7     Q   And how many of those consisted largely of
 8  new previously unreleased material?
 9     A   Ten.
10     Q   And the rest were compilations of
11  previously released material?
12     A   Yes.
13     Q   Was it largely 2-Live Crew or other
14  artists who you released?
15     A   I have licensed material.
16     Q   From others?
17     A   Yes.
18     Q   You mentioned or you testified you said in
19  many depositions, is that correct?
20     A   Yes.
21     Q   Between 20 and 50, I think you said?
22     A   Yes.
23     Q   In each of those cases were you or an
24  entity that you controlled a party to the lawsuit?
25     A   Yes.  Not in every one of the cases.
```

Page 58

```
 1     Q   But in most of the cases?
 2     A   I would say half.
 3     Q   Has Lil' Joe Records, Inc. filed any
 4  lawsuits?
 5     A   Yes.
 6     Q   So it's been a plaintiff in lawsuits?
 7     A   Yes.
 8     Q   How many?
 9     A   I don't know, a dozen maybe.
10     Q   Has Lil' Joe Wein Music, Inc. been a
11  plaintiff in lawsuits?
12     A   Yes.
13     Q   How many?
14     A   Seven or eight.
15     Q   In the interest of time, because counsel
16  is not feeling so well, is there a simple way that
17  you could summarize the nature of what those 20 or
18  so cases were about and, you know, without going
19  into them one by one?
20     A   Enforcement of contractual rights against
21  artists and copyright infringement, trademark
22  infringement.
23     Q   Has Lil' Joe Records, Inc. been a
24  defendant in any lawsuits?
25     A   Yes.
```

Page 59

```
 1     Q   How many?
 2     A   I think three cases.
 3     Q   Has Lil' Joe Wein Music, Inc. been a
 4  defendant in any cases?
 5     A   Lil' Joe Wein Music has been a defendant
 6  in this case and I think three cases.
 7     Q   And again, is it possible to summarize the
 8  subject matter of those six or so cases without
 9  discussing them one by one?
10          MR. WOLFE:  Object to the form.
11          I don't think you've ever established that
12       it's not the same three cases together or if
13       it's six --
14  BY MR. GOLDMAN:
15     Q   Were there six cases in total or did some
16  of those cases overlap?
17     A   I there were only three cases.
18     Q   So Lil' Joe Records, Inc. and Lil' Joe
19  Wein Music, Inc. was a defendant in all three?
20     A   Yes.
21     Q   With that correction in mind, what was the
22  nature of those three, were they all different, then
23  just tell me which each one was about.
24     A   There was one that was a copyright
25  infringement case.  There was one that was an
```

Page 60

```
 1  employment case and there was one that was an attack
 2  on, a collateral attack on my ownership of
 3  copyrights that I acquired from Luke Records
 4  bankruptcy.
 5     Q   Who filed that one?
 6     A   Jeffrey Thompkins.
 7     Q   Who is Jeffrey Thompkins?
 8     A   He was a member in the group Poison Clan.
 9     Q   When was that lawsuit filed?
10     A   2002.
11     Q   Is it still pending?
12     A   It's still -- I got a summary judgment
13  against them and it's on appeal.
14     Q   It's on appeal to the 11th Circuit?
15     A   Yes.
16     Q   What is the status of the appeal?
17     A   No decision --
18     Q   Have briefs been filed?
19     A   Oral argument was about year ago.
20     Q   So there were briefs filed and oral
21  argument?
22     A   Yes.  Before a panel of three judges.
23     Q   And I take it you don't know when there
24  will be --
25     A   Well, they don't expect a decision for a
```

Page 61

1   period of time because there are two circuit judges
2   from different circuits sitting by designation and
3   they have to get all three people into Atlanta to do
4   something.
5       Q   When was the oral argument?
6       A   I think October of last year.
7       Q   When was the summary judgment obtained?
8       A   December of 2004.
9       Q   In general terms, what was the basis of
10  his claim that was thrown out on summary judgment?
11      A   That I didn't own the material, that
12  I infringed his trademark and that I infringed his
13  copyright and I committed fraud on him.  I think
14  that's basically, you know, the different
15  allegations that he claimed or he also claims he
16  owned the copyrighted materials.
17      Q   All of it?
18      A   Yeah.  And the judge found that he did not
19  because he had signed over his rights.
20      Q   Was he a partner on the Luther Campbell --
21          MR. WOLFE:  Counsel, let me clarify
22  something because I don't think you're talking
23  about the same thing.
24          The witness is talking about the Poison
25  Clan material and I think you're talking about

Page 62

1   all the material, the Luke material --
2           MR. GOLDMAN:  I was talking about all of
3   materials that you know you have come to own
4   through --
5           THE WITNESS:  No, Thompkins is only
6   talking about the Poison Clan material.  The
7   lawsuit was limited to the copyrights of the
8   Poison Clan material.
9   BY MR. GOLDMAN:
10      Q   I understand, so as far as the copyright
11  aspects of that lawsuit it only had to do with
12  poison clan?
13      A   The ones that he was an artist on.  He was
14  also claiming copyrights when he was a side artist
15  on some.
16      Q   Which ones were those?
17      A   There were a couple of songs.  I don't
18  remember.  A couple on Luke solo, the Luther
19  Campbell solo.
20      Q   Did any of the copyright issues in this
21  lawsuit that we're here about today, were they an
22  issue in that lawsuit?
23      A   No.
24      Q   Now, among some of the lawsuits that Lil'
25  Joe Records, Inc. and Lil' Joe Wein Music, Inc. were

Page 63

1   involved in were contractual rights against artists
2   you said?
3       A   Yes.
4       Q   What artists did you sue?
5       A   I sued Christopher Wong Wa, Dante Terrell
6   Carter and I think I may have a fraud lawsuit
7   against David Hobbs and Mark Ross, I think that's
8   it.
9       Q   Is there a common theme as to the
10  particular rights that were involved?
11      A   People either tried to use things they
12  didn't own or didn't want to work after they got
13  paid to do work.
14      Q   When?
15      A   Or wanted to work elsewhere where they
16  could use things that they did own.
17      Q   When you say use things they did not own,
18  are you talking about copyrights or trademarks?
19      A   Yes.
20      Q   Trademarks including the name 2-Live Crew?
21      A   Yes.
22      Q   You also said you sued various people for
23  copyright infringement and trademark infringement?
24      A   Yes.
25      Q   Could you list those people or entities?

Page 64

1       A   Well, obviously this case, and World Wide
2   Pants --
3       Q   David Letterman's company?
4       A   Yes.
5       Q   What did they do?
6       A   That's a subject of a confidentiality
7   agreement.
8       Q   It was settled?
9       A   Yes.
10      Q   So the nature of the Complaint is public
11  record?
12      A   Yes.
13      Q   So what was alleged?
14      A   The Craig Kilborne Show which is owned by
15  World Wide Pants used Me So Horny, which I had a
16  copyright and they used it in numerous episodes of
17  the show without obtaining a license.  It was
18  hundreds of episodes.
19      Q   What was the nature of the use?
20      A   That they used part of the song, they
21  played it, they used it to introduce guests.
22      Q   The actual sound recordings.
23      A   Their version of the sound recording.
24  They made a version.
25      Q   Would that involve the music and the

Page 65

1  lyrics?
2     A   Yes.
3     Q   The music was taken from 2-Live Crew?
4     A   The song, yes.  The lyrics were taken from
5  the song Me So Horny.
6     Q   So was it the lyrics that were used?
7     A   Yes.  Part of the actual recording.
8     Q   What specific lyrics were used?
9     A   I don't remember, it was six years ago.
10    Q   What words, was it the words Me So Horny?
11    A   Probably --
12    Q   Any others?
13    A   I don't remember.  You know, part of the
14 lyrics after that, you know, somewhere in the song
15 but I don't remember which version.
16    Q   Was it your claim that owned the copyright
17 for the words "Me So Horny?"
18    A   Yes.
19    Q   Is that still your contention?
20    A   Yes.
21    Q   Wasn't the term "Me So Horny," originated
22 in a Stanley Kubrick film Full Metal Jacket?
23    A   Yes.
24    Q   And that came before the 2-Live Crew song?
25    A   Yes.

Page 66

1     Q   And the "Me So Horny" was adapted from
2  that movie, correct?
3     A   Yes.
4     Q   And you still claim that you own the
5  copyright for that phrase?
6     A   In the way it was used, yes.
7     Q   What do you mean in the way it was used,
8  how was it used differently?
9     A   The way it was used as alleged with the
10 music.
11    Q   So separate and apart from the music?
12    A   I don't understand the music would mean --
13 maybe I didn't understand your question.
14    Q   Separate and apart from the music, you're
15 claiming that the phrase me so horny --
16    Q   Yes.
17    Q   Even though the phrase was used
18 previously?
19    A   Yes.
20    Q   You're saying it was not original to
21 Luther Campbell because that phrase as you have
22 described it was adapted from prior use by somebody
23 else?
24    A   Yes.
25    Q   Then you would agree if a phrase like "I

Page 67

1  like it, I love it," for example, were adapted from
2  some other use that you wouldn't have the copyright
3  on that phrase?
4     A   It would depend upon the way it was used.
5     Q   Separate and apart from whatever music it
6  was associated with with the words, I like it, I
7  love it; you wouldn't own the copyright if it was
8  used from previously adapted use in that song?
9     A   It's my understanding that you can't get a
10 copyright on the words themselves.  It has to be the
11 words and music.
12        You can't get a copyright on a short
13 phrase just by itself, it's got to be part of
14 something.
15    Q   With respect to the term, go something
16 blank, it's your birthday, if it had been adapted
17 from some prior use you wouldn't have a copyright on
18 that phrase?
19    A   It depends on how it's used.
20    Q   Separate and apart from the music, for our
21 discussion on the words, would you agree with that
22 statement?
23    A   As I told you just a couple of minutes
24 ago, you could not get a copyright on words.  I
25 don't think you can get a copyright on just words.

Page 68

1  It has to be associated or accompanied with music
2  that is also similar.  That's one instance.
3     Q   What other instance could be infringing?
4     A   I mean you can't get a copyright on words
5  but I can get a copyright on words as part of a
6  compilation of a song or a thing of that nature,
7  but not a short phrase standing along, my
8  understanding is you can't get a copyright on a
9  phrase.
10    Q   We talked about World Wide Pants and that
11 case and you listed other defendants that you had
12 copyright infringements that you filed for copyright
13 infringement or trademark infringement.
14        Who were the other defendants?
15    A   Full Line Entertainment, Atlantic
16 Recording Corporation and currently I have a case
17 against Chistropher Wons Wa.  I'm not sure about
18 some of the other cases I mentioned, you know, the
19 contractual things also had some copyright
20 infringement allegations so I'm not sure.
21    Q   How many lawsuits altogether have been
22 filed by Lil' Joe Records and Lil' Joe Music, Inc.?
23    A   I thought I told you about a dozen.
24    Q   I thought you said about 12 for Lil' Joe
25 records and about eight for Lil' Joe Wein Music.

Page 69

1     A   Well, there's a lot of overlap in all
2  those cases.
3     Q   So altogether about 12?
4     A   Yes.
5     Q   You listed about eight or nine from what
6  I can tell. Are there any others come to mind?
7     A   You're talking about copyright and
8  trademark cases?
9     Q   Yes.
10    Q   There's a case I brought against Jerry
11  Springer. I don't know if it was against him or
12  Artisan Entertainment.
13        I think part of that case dealt with
14  copyright infringement.
15    Q   Anything else?
16    A   I don't remember anything else. Like I
17  said there were some other cases against artists but
18  I don't know if there was stuff in there also as,
19  you know, the Thompkins case had a counterclaim for
20  copyright infringement. That was another case. I
21  also had another case it was called Strictly Rhythm.
22  I can remember any other ones.
23        MR. GOLDMAN: Let me mark as a composite
24  exhibit a document from the bankruptcy case and
25  also we'll mark two documents from the

Page 70

1  bankruptcy case, mark them as 1 and 2.
2        [Thereupon, the aforementioned documents
3  were marked as Defendant's Exhibit Nos. 1 and 2 for
4  Identification, respectively.]
5  BY MR. GOLDMAN:
6     Q   Directing your attention to Exhibit No. 1,
7  does this appear to give you -- let me give you the
8  official marked one first.
9     A   Yeah, I'm looking for the sticker.
10    Q   Do you recognize this document?
11    A   Yes.
12    Q   What is it?
13    A   It is an order conforming the
14  reorganization of Luke Records and Luther Campbell
15  combined bankruptcy cases.
16    Q   Is that the order that is effectively --
17  and I don't know if that's the right phrase -- is
18  this the order that effectuated your transfer of the
19  copyrights that are at issue in this case, to your
20  companies?
21    A   Yes.
22    Q   To Lil' Joe Wein Music, Inc.?
23    A   Yes.
24    Q   Then Exhibit No. 2 is a document entitled
25  Bill of Sale and it also came from the Bankruptcy

Page 71

1  Binder, is this the actual sale document?
2     A   This is a copy of the Bankruptcy Binder
3  that I was provided with.
4     Q   This is the actual bill of sale that is
5  the legal document that effectuated the sale or
6  memorialized the sale of those assets to you or Lil'
7  Joe Wein Music, Inc.?
8     A   I think so, yes.
9     Q   If you would look at the list of
10  compositions that start on the third page, and they
11  don't appear to be numbered, but if you would look
12  at the list --
13    A   How are you counting pages?
14    Q   The third page of the document.
15    A   Okay.
16    Q   This appears to be a list of the
17  compositions?
18    A   Yes.
19    Q   And it keeps going through, alphabetically
20  it keeps going and you'll see the song, I like It, I
21  Love It and the song on the following page, It's
22  Your Birthday?
23    A   Yes.
24    Q   And I Like It I Love It lists as the
25  author Luther Campbell, David Hobbs, Mark Roth,

Page 72

1  Chris Wons, and then on the next page It's Your
2  Birthday lists, just Luther Campbell as the author?
3     A   Yes.
4     Q   And this is the document which you rely on
5  for the claim of copyright ownership of these two
6  works?
7     A   This and the order from the judge.
8     Q   Are there any other documents that you're
9  aware of that also comport to effectuate --
10    A   There are some documents, particular
11  documents from the various people. David Hobbs, Mark
12  Ross and Chris Wons Wa where they relinquished or
13  transfer their rights -- you know, this one is not
14  the one that Jim Leeshaw did -- this is not the
15  one --
16        MR. GOLDMAN: Is there a discrepancy in
17  that document?
18        MR. WOLFE: There has to be another one of
19  these documents that has my signature on it,
20  another one that I signed.
21        THE WITNESS: The one that I had in the
22  binder was signed by Jim Leeshaw of Greenberg
23  Traurig but it was also signed by my attorney
24  Richard, so we're looking for the document --
25  this document doesn't have Richard's signature

Page 73

1    on it.
2   BY MR. GOLDMAN:
3       Q   So you believe that there is another
4   version of the document that does have Richard's
5   signature on it?
6       A   Yes and it should be in the documents, it
7   should be with the assignment that was recorded in
8   the copyright office.  The assignment should also
9   have Richard's signature.
10          This is a bill of sale but there is a
11  copyright assignment document.
12          MR. GOLDMAN:  Let me mark this as Exhibit
13  No. 3.
14          [Thereupon, the aforementioned document
15  was marked as Defendant's Exhibit No. 3 for
16  Identification.]
17  BY MR. GOLDMAN:
18      Q   Let me ask you to take a look at that --
19      A   It's a table of contents.
20      Q   This is a Xerox copy of a cover page of
21  the closing binder and table of contents, is that
22  accurate?
23      A   This page itself was on the cover page of
24  the closing binder that I have.  It may have been
25  something that was put on file which identified it.

Page 74

1   It may have identified that thing as what it was.
2       Q   But in any event the three or four pages
3   following the first page are the table of contents
4   of the closing binder?
5       A   Yes.
6       Q   And that binder was provided to you from
7   Greenberg Traurig?
8       A   Yes.  They allowed everyone to purchase
9   the binder, you know, they were bankruptcy lawyers.
10  Jim Leeshaw put together this binder.
11      Q   If you could take a look at the table of
12  contents there and tell me if there are any other
13  documents listed here that you would consider
14  critical in the effectuation of transfer of
15  documents or the transfer of copyright to Lil' Joe
16  Wein Music, Inc.?
17      A   Yes.
18      Q   Which ones?
19      A   Well, the Master Recording Assignment, No.
20  8 and let me see, No. 18 -- I'd also have to look at
21  No. 16 if there's something in that document.  And
22  let me see, I want to make sure about that one.
23      Q   What number, 16.
24      Q   Right.  I'm not sure if it's relevant but
25  I'd like to make sure.  There's a copyright

Page 75

1   assignment too, I don't know, you know, if I refer
2   to the copyright assignment there was a recording --
3   you know, that was recorded in the copyright office,
4   I don't know if that's on this list or not.  I'm
5   trying to skim through this real quick.
6       Q   So you're saying document No. 3, 8, and 18
7   and maybe 16 --
8       A   Well, also No. 2 and No. 3, 2 is the
9   reorganization that was approved by the court.
10      Q   So we have 1, 2, 3, 8, 18, maybe 16 that
11  you consider relevant to the transfer of the
12  copyrights?
13      A   You're talking about the two copyrights?
14      Q   The two copyrights.
15      A   Yes.
16      Q   And the issues in this case --
17      A   And the other transfer from David, you
18  know, there was a transfer from David Hobbs, Mark
19  Ross and Christopher Wons Wa, those.
20      Q   That is not part of the closing binder?
21      A   No, but they were like other transactions.
22      Q   Those were produced to us separately?
23      A   Yeah, they're in that box of documents and
24  there's also the recordings from the copyright
25  office, you know, all the recordings in the

Page 76

1   copyright office.
2       Q   Did any of these documents contain any
3   specific representations with respect to the
4   original or copyright ability any of the materials
5   in these songs?
6       A   I don't remember.
7       Q   You don't recall?
8       A   I don't know.  I haven't looked at these
9   documents in probably ten years.
10      Q   As you sit here today, you can't recall
11  any specific representations in that regard?
12      A   I don't know of any.
13          MR. GOLDMAN:  Let's mark this next exhibit
14  as No. 4.
15          [Thereupon, the aforementioned document
16  was marked as Defendant's Exhibit No. 4 for
17  Identification.]
18  BY MR. GOLDMAN:
19      Q   Can you tell me what Exhibit No. 4 is?
20      A   It is a PA's for the copyrights for
21  the songs.
22      Q   For what songs?
23      A   It looks like it's for I Like It I Love It
24  and It's Your Birthday and it's also It's Your
25  Birthday Remix and one was a list of special edits

Page 77

1  and then there's a It's Your Birthday Bonus Mix --
2     Q   Let's start focusing first of all on the
3  registrations for It's Your Birthday.
4        Let's orient ourselves. We're talking
5  about the first one here listed It's Your Birthday
6  Remix XR218, is that correct?
7     A   Right.
8     Q   And then there's listed one Luke (It's
9  Your Birthday Bonus Mix) XR256 clean, is that right?
10    A   Yes.
11    Q   Then I believe the third and final one is
12  simply titled It's Your Birthday, is that right?
13    A   Right.
14    Q   And these PA's or registrations are for
15  Lil' Joe Wein Music, Inc. that were filed for It's
16  Your Birthday?
17    A   Yes.
18    Q   Taking them in order which they were
19  filed, let's start with the last one, the title of
20  the work listed It's Your Birthday, tell me --
21    A   Which one are you talking about?
22    Q   The very last on in this set at the very
23  end, I think it's PA -- here it is, PA 877-745?
24    A   Okay.
25    Q   The effective date of the registration is

Page 78

1  August 4th, 1997?
2     A   Correct.
3     Q   And Lil' Joe Wein caused this to be filed
4  with the copyright office at that time?
5     A   Right.
6     Q   Why was it filed at that time as opposed
7  to earlier or later?
8     A   When I acquired assets from Luther
9  Campbell there were only 40 or 50 actual
10  registrations of sound recordings or PA's that had
11  been filed on all of the works that he had produced.
12  So I went through along with Jonathan Blank and made
13  a list -- he actually went up to the copyright and
14  did a search to see if there were any other ones
15  that we could find. So we didn't find any others so
16  we registered everything that was not registered.
17    Q   So Luther Campbell had some of his musical
18  compositions registered and some not --
19    A   A very small percentage were registered.
20    Q   Were you involved when you were working
21  for Luther Campbell, were you involved with
22  registration of any of those copyrights?
23    A   No.
24    Q   Who handled that?
25    A   No one.

Page 79

1     Q   With respect to the ones that were filed,
2  someone must have been involved, who was it?
3     A   Two people, one was Windswept Specific
4  which is a company and then there was another one
5  called Longitudinal Windswept Company, they were an
6  administrator of Luke's copyrights during the
7  Atlantic Recording contract period and also Jonathan
8  Blank.
9     Q   Who is Jonathan Blank?
10    A   He is an attorney, an outside attorney who
11  at the time worked --
12    Q   Was he an outside attorney or did he work
13  for Luther Campbell?
14    A   He was an outside attorney, business
15  consultant.
16    Q   Was it Windswept Specifics contractual
17  duty to register these copyrights?
18    A   Yes.
19    Q   And they failed to register all of them?
20    A   Yes.
21    Q   Did they consult with you or Luther
22  Campbell with respect to which ones should be
23  registered and which ones shouldn't?
24    A   No.
25    Q   How do you know that?

Page 80

1     A   There was a dispute with Windswept
2  Specific that I was involved in in which a
3  settlement agreement was reached and which I
4  provided you with a copy of so I know firsthand.
5     Q   A settlement related to the failure of
6  Windswept Specific to properly register all the
7  copyrights?
8     A   In part, yes.
9     Q   That was one of the issues --
10    A   I was one of the issues, don't know if it
11  was specifically mentioned in the settlement but
12  that was one of the reasons that they settled, that
13  we paid back or not we, that Luther Campbell paid it
14  back to them.
15    Q   Was a lawsuit filed?
16    A   No.
17    Q   A settlement was reached without having to
18  file a lawsuit?
19    A   Yes.
20       MR. WOLFE: Let's go off the record for a
21  second.
22       [Thereupon, a short recess was taken.]
23       MR. GOLDMAN: We took a short break. We
24  were talking about the registration PA 877-745,
25  It's Your Birthday, and that Lil' Joe Wein

Page 81

1    Music, Inc. filed?
2        THE WITNESS:  Yes.
3    BY MR. GOLDMAN:
4        Q   Did you have any input into the material
5    that was typed into this form?
6        A   Probably
7        Q   You don't recall one way or another?
8        A   Well, I hired Jonathan Blank to help me do
9    this and/or organize this registration which I got
10   as it says in '96.  You know, he worked with me for
11   several years part time along with Connie Weaver who
12   was a secretary, clerical person to do this thing.
13       Q   Directing your attention to Section 3 of
14   the form, you see where it says, year in which
15   creation of this work was completed, it says 1994,
16   it's 1994 typed in by Lil' Joe Wein Music, Inc.?
17       A   Yes.
18       Q   And to the right of that under Section B
19   it says date and nation of first publication of this
20   particular work, it says 1994?
21       A   Right.
22       Q   That was also typed in by Lil' Joe Wein
23   Music, Inc.?
24       A   Yes.
25       Q   Do you know how these dates came to be

Page 82

1    used for this form?
2        A   Probably the release date of the song.
3        Q   Was this the first version of It's Your
4    Birthday ever released?
5        A   Ever released, I think so, I'm not sure if
6    this is a correct date.
7        Q   Of release?
8        A   Right.
9        Q   What would you have to look at to be sure?
10       A   I don't know where this date came from.
11   It was during 1994, I thought it was around July but
12   it could have been September.
13       Q   But it was definitely in '94?
14       A   Yes.
15       Q   To your knowledge the song was written on
16   or about that time?
17       A   Probably not.
18       Q   Why do you say that?
19       A   Well, the albums in general, you know,
20   without specifics, let me see, the album Free For
21   Life album may have been recorded over a many, many
22   months period.  Because what would happen is Luther
23   Campbell, when he was doing his albums, you know, he
24   was also out performing concerts and, you know, he
25   was a performer, so either him or his self, as part

Page 83

1    of doing this, you know, during that time period at
2    that time the group was called New 2-Live Crew so
3    since he was out doing performances -- he didn't
4    have a lot of time to record.  You know, he'd record
5    one song, when he'd come back in town, like during
6    breaks to handle business as far as personal
7    business and other corporate business.
8        He would record songs and I don't know,
9    how long it was because I'd have to look, for this
10   particular song I'd have to look at the studio reels
11   to tell when this thing was recorded.  You know, it
12   was on The Need To Be Free Live album.
13       Q   And The Need To Be Free Live album you
14   believe was released -- this was probably the
15   correct date?
16       A   It was either September '94 or July --
17   July or September.
18       Q   Was The Need To Be Free Live album a solo
19   Luther album?
20       A   Yes.
21       Q   Was it the first one?
22       A   No.
23       Q   What was the prior Luther Campbell solo
24   album?
25       A   It was called Nude, N-u-d-e.

Page 84

1        Q   When was the released?
2        A   2003.
3        Q   That was also a Luther Campbell solo
4    album?
5        A   Yes.
6        Q   Do you know when in 2003 that was
7    released?
8        A   That one was released in July I think.
9        Q   And The Need To Be Free Live was September
10   '94?
11       A   Yes.
12       Q   So that was about 14 months that was a
13   separation between The Need To Be Free Live?
14       A   Yes.
15       Q   And based upon your observations of Luther
16   Campbell he would go out on tour, perform songs and
17   then he would come back in Miami for business
18   reasons and while in Miami he would record some
19   songs --
20       A   Right.
21       But the difference with this scenario that
22   you talked about and the Nude album and The Need To
23   Be Free Live album was that album was released in
24   February 2004 by the New 2-Live Crew --
25       Q   1994?

Page 85

1   A   1994, didn't I say '94?
2   Q   No.
3   A   Well, it was 1994 and the next album was
4   called Back At Your Ass and that was released in
5   February of 1994.
6   Q   So let's make sure the record is clear,
7   the Nude album was Luther Campbell solo album that
8   was released July of '93?
9   A   Yes.
10   Q   And the New 2-Live Crew released album was
11   February of 1994?
12   A   Right
13   Q   And the Luther Campbell Need To Be Free
14   Live album was September '94?
15   A   Right.
16   Q   And all three of these albums were albums
17   that Luther Campbell performed on as an artist in
18   that time, period, '93, '94?
19   A   Yes. He may have appeared on some of the
20   artists that I told you about as a side artist.
21   Q   My question was the opposite. I'm just
22   trying to orient us in order of the Luther Campbell
23   works in which he was a key performer.
24   A   That wasn't clear.
25   Q   I'll try to clear it.

Page 86

1       So Nude and Need to Be Free Live was his
2   procedure to put out an album after he had enough
3   songs that he was satisfied with?
4   A   Sometimes he would make recordings of
5   songs that he didn't use on his album and he'd use
6   them on a subsequent album.
7       So I would have to look at particular
8   studio reels to refresh my memory as to a particular
9   song.
10   Q   So you don't know whether It's Your
11   Birthday was actually recorded --
12   A   I'd have to look at the studio reel, I
13   have to pull out The Need To Be Free Live studio
14   reel.
15   MS. STETSON:   What we'd like to do is have
16   him pull out those studio reels for us.
17   MR. GOLDMAN:   Is it possible for you to be
18   able to tell from looking at the reels what
19   date those were recorded on?
20       Just for the record, can you tell us what
21   you're looking at. Well, let me see.
22       This is reel 1249 and it has an orange
23   sticker that says 1249 and on the front it's
24   written, well, it looks like Luke, 1994 and
25   then it says number one, spin number one,

Page 87

1   revised and then it says number two, It's Your
2   Birthday, and then number three it says spin
3   number three, is that accurate?
4   THE WITNESS:   Yes.
5   BY MR. GOLDMAN:
6   Q   Is it possible that we can get covers of
7   all this and the envelope too, maybe during the
8   lunch break, we can copy those and then I'll make
9   them an exhibit.
10       Sir, are you able to look at these reels
11   and tell us when the song were recorded without
12   putting the reel on a recording device?
13   A   I think so.  There are work sheets.
14   MR. GOLDMAN:   Let the record reflect the
15   that witness opened the box and there were a
16   few pages or work sheets with the reel.
17   THE WITNESS:   There appears to be three
18   different dates that correlate with what is
19   written on the outside of the box.  One date
20   says March 31st, it says actually 3/31/94. One
21   says 4-7-94 and one has a small, you know,
22   something also added, that says I think it's 00
23   and 0 which says 4-11-94.
24       Of these three pieces of paper one lists
25   the title as It's Your Birthday and it contains

Page 88

1   a date April 7th. 1994.
2       There's also this thing that says spin
3   number one revised listing the first item on
4   here.
5   BY MR. GOLDMAN:
6   Q   Do you know what spin number one, spin
7   number three are.  Are they other versions of Its'
8   Your Birthday or is it different material?
9   A   It should be It's Your Birthday, that's
10   the only thing on here on the yellow sticker.
11   Q   In any event, based upon these documents
12   is it your testimony that It's Your Birthday was
13   recorded sometime between March 31, 1994 and April
14   11th, 1994?
15   MS. STETSON:   I think he wants to look at
16   the second reel as well.
17   MR. GOLDMAN:   Before you do that, let me
18   just put this on the record.
19       The second reel has an orange sticker that
20   says, 11-93 on the orange sticker and it has a
21   sticker on it that lists on this sticker, I
22   guess was added afterward, this was -- this
23   sticker you're talking about is the real date.
24   8-7-96 was added later on?
25   THE WITNESS:   I think so.

Page 89

1  BY MR. GOLDMAN:
2     Q   Well, actually written on this thing in
3  pencil, in pencil it says, let me see if I can read
4  it. Luke 1994, then number one it says C'mon,
5  C-'-m-o-n, then number two It's Your Birthday, three
6  MF number seven, four, Happy Birthday intro piece,
7  is that right?  Is that what it says?
8     A   I can't see with these glasses.
9         This says MF number seven, that's what it
10  says, yes.
11        Did you talk about the things that were
12  crossed out like spin number three is crossed out.
13     MR. GOLDMAN:  We'll take -- we'll make
14        copies of this also during the break.
15  BY MR. GOLDMAN:
16     Q   Do these thing correlate with different
17  dates than these?  Let me ask you how many sheets
18  were inside this reel 1193?
19     A   Four.
20        And the dates on the two different sheets
21  are, there's 3-28-94 which doesn't correspond with
22  any of these dates then there's two other dates.
23  One sheet says 3/12/94 and I don't think that
24  correlates with any of these dates and then there's
25  3/31 and then there's 4/7 and then there's 4/11 --

Page 90

1     Q   Are we able to pin these down as the date
2  they were initially recorded or that it was some
3  time in March or April of 1994, can you say that?
4     A   I guess.  That's what the sheets show.
5        Is that consistent with your recollection that
6  it was March or April of 1994?
7     A   It would appear to be.
8     Q   Is it your understanding that these types
9  of records would have been made contemporaneously
10  with the recording?
11     A   Usually, yes.
12     Q   As far as you know they were made
13  accurately?
14     A   They should be accurate.
15     Q   As far as the one on track two the people
16  who worked on Luke's projects were very particular.
17     MS. STETSON:  The people who worked on
18        projects?
19     THE WITNESS:  Yeah, the engineers.
20  BY MR. GOLDMAN:
21     Q   They would be the ones who would fill out
22  this documents?
23     A   Yes.
24     Q   Was it Mr. Campbell's practice, if you
25  know, to generally record -- well, let me ask it

Page 91

1  this way.
2        At what stage of the process of creation
3  would Mr. Campbell generally decide that he wanted
4  to record a song in the studio?
5     A   Well, someone -- it would depend upon
6  which producer or person did the track.
7        When Michael Stirling, your client, was
8  the engineer on the project or David Hobbs who was a
9  2-Live Crew producer they, David Hobbs and him,
10  Michael Stirling would create a track usually
11  although like on I Like It I Love It, that was not
12  done by Michael Stirling.  That was done by David
13  Hobbs.
14        There were other reels of I Like It I Love
15  It.
16     Q   Well, we'll get to those in a moment.
17        Were you present when Mr. Campbell would
18  write new music, like it's your birthday, usually
19  what would happen, as if --
20     A   Let me just tell you how things went with
21  Luther.
22        There would be a group of people, that
23  were called the ghetto style deejays who worked for
24  him and in his warehouse that would come to the
25  studio at night when he would be doing his

Page 92

1  recording.  They would all be bullshitting back and
2  forth and drinking and stuff like that.  And he
3  would be, you know, acknowledging they were going to
4  be doing this or doing something then, they would do
5  something and then he would say -- they would say,
6  no, change this word or change this or change this.
7  Now, I'm not sure on this particular song if they
8  did that but you know they were a lot of in-crowd
9  noises you can see and hear some of the chant stuff
10  like that, so you see the crowd and that indicates
11  to me that they were there.  So there must have
12  been a bunch of these people present, you know, and
13  they'd be talking with Luke about girls and
14  different things that they did on the road or things
15  that were happening and then he would go in and do
16  some and say, you know, no, no, I want to change
17  this or I want to change that, and then he'd go back
18  into the recording booth and change it, it was
19  things like that.
20     Q   So the creation of songs was generally
21  simultaneously with the recording?
22     A   The later recordings.
23     Q   The ones during this time period '94 --
24     A   Right.  You know, yeah.
25     Q   '94 you're talking about?

Page 93

1    A   Right.
2    Q   So he would -- Mr. Campbell generally
3  wouldn't come to the studio with music on a sheet or
4  lyrics where he wrote it out?
5    A   No, never, not by himself.
6    Q   Would others?
7    A   Well, when he was part of 2-Live Crew,
8  David Hobbs and Michael did, you know, the earlier
9  2-Live Crew recordings Michael and David had sheet
10  music and, you know, but not Luke, you know, they
11  were very musical. David also is very musical.
12  Michael was very musical so they would have stuff
13  like that, which was better organized for the
14  recordings and you know, the ones that were done by
15  the two of them, you know, David and Michael, they
16  were much better quality recordings than the later
17  recordings.
18    Q   So Luther Campbell was not, do you know if
19  he could read music?
20    A   He didn't know how to read music.
21    Q   Do you know if he could write music?
22    A   No, he didn't know how to write music.
23    Q   So generally speaking from your experience
24  with these songs they would have been created by
25  Luther the same night they were recorded?

Page 94

1    A   These later ones, yes.
2    Q   We're talking about the ones in 1994?
3    A   Yes.
4    Q   It's Your Birthday, those were recordings
5  that were consistent with that technique?
6    A   Yeah, this song and various 2-Live Crew
7  songs, they would, you know, use other 2-Live Crew
8  music.
9    Q   What are you saying that they would use
10  existing music and then add the lyrics?
11    A   Well, the spin guy was something, you
12  know, they would be sampling, you know, existing
13  2-Live Crew songs.
14    Q   Do you have a recollection of It's Your
15  Birthday being created in the studio?
16    A   Yeah, I think so.
17    MR. GOLDMAN: You know what. I think we
18    should take a break here and we can go over
19    these, we can go off the record, we don't need this
20    on the record.
21    [Thereupon, a short recess was had in
22    order to talk about the reels and then a lunch break
23    was decided upon; thereupon, a lunch recess was
24    taken.]
25    MR. GOLDMAN: First of all, we're marking

Page 95

1    Exhibits 5, 6, 7 as the sheets that we looked
2  at before we broke for lunch.
3    [Thereupon, the aforementioned documents
4  were marked as Defendant's Exhibits Nos. 5, 6 and 7
5  for Identification, respectively.]
6  BY MR. GOLDMAN:
7    Q   All right, sir. We've had the reporter
8  mark Exhibits 5, 6 and 7 which are photocopies and
9  what do you call those documents?
10    A   They are called studio track sheets.
11    There's also included copies of the
12  outside of the various parts of the box that
13  contained the reels of tape.
14    [Thereupon, a short off the record
15  discussion was had.]
16    MR. GOLDMAN: Can we go back on the
17    record.
18  BY MR. GOLDMAN:
19    Q   Do you know who 50 Cent is?
20    A   I know who he is, yes.
21    Q   He's one of the defendants in this
22  lawsuit?
23    A   Yes.
24    Q   Have you ever spoken to him?
25    A   No.

Page 96

1    Q   I take it that you have never communicated
2  with him about the claims in this case?
3    A   No.
4    Q   In writing or orally?
5    A   No. But I don't know what Mr. Wolfe has
6  done.
7    Q   You personally have never spoken to him or
8  any of his representatives?
9    A   There was someone that called me that
10  claimed that, you know, they were from Universal and
11  that they were in touch with Jim Iovini and that
12  they had Jim Iovini with him and they kept on
13  calling and they said they were going to give me an
14  offer to resolve this case. They never did.
15    Q   Do you know who the person was who called
16  you?
17    A   I don't recall. It was a Chinese guy, a
18  Chinese sounding name.
19    Q   Do you know when this gentleman called
20  you?
21    A   Right after the lawsuit was filed.
22    Q   Is that the only communication that you
23  had with any representative of any of the defendants
24  about this case?
25    A   Could I ask Richard a question?

1    MR. GOLDMAN: Okay.
2    MR. WOLFE: I don't think it's appropriate
3  during a pending question.
4    MR. GOLDMAN: I agree but I was going to
5  allow it. I don't think, you know --
6    THE WITNESS: All right. The answer is
7  no.
8  BY MR. GOLDMAN:
9    Q   Have you now had the opportunity to look
10  at Exhibits 5, 6 and 7?
11    A   Yes.
12    Q   Do they accurately reflect these studio
13  track sheets and the material written on the outside
14  of the boxes of the reels of tape for It's Your
15  Birthday and I Like It I Love It?
16    A   Yes.
17    Q   All right. Let's get to where we were
18  before we took a lunch break. Based upon these
19  records, your best recollection is that It's Your
20  Birthday was written on the same day or the same
21  night that it was recorded in March or April of
22  1994?
23    A   Yes.
24    Q   And you did not observe Mr. Campbell
25  writing the song, any lyrics prior to that time

1  period?
2    A   I don't remember. I never observed him
3  writing any lyrics.
4    Q   He would make the lyrics up as he went
5  along?
6    A   Or, as I told you before, you know, there
7  were people there and they would be saying something
8  and he would repeat it.
9    You have no reason to believe that --
10  well, let me ask it this way.
11    You have no reason to believe that any
12  other method of creativity was used to create this
13  work?
14    A   No.
15    Q   No, you don't?
16    A   No.
17    Q   The same question has to do with I Like
18  It, I Love It. Do you know --
19    A   The difference with that song and I
20  explained this to you earlier, is that David Hobbs
21  was the producer and as the producer he was a lot
22  more organized.
23    A lot of times there would be or all the
24  time on every song he produced, everything was
25  written ahead of time. It was very, there was very

1  ad libbing.
2    Q   All right. Let's start here on Exhibit
3  No. 7, you indicated that the song I Like It, I Love
4  It, was recorded in June, June 19th 1991?
5    A   That's what it states, June 1991, yes.
6    Q   You have no reason to believe that it was
7  recorded at any date prior to that?
8    A   There was another version of the song
9  called Sex, I Like It, I Love It and that was done
10  in a live concert that was done in 1990.
11    That studio reel I could not find.
12    That was -- that was from a live in
13  concert album.
14    Q   So it's your belief, that I Like It, I
15  Love It, was written in 1990 or sometime prior to
16  that or you don't know?
17    A   I don't know.
18    Q   You don't know when it was, you were not
19  present when it was created?
20    A   I was present when one, the one on item
21  seven was created.
22    Q   Did you -- were you present on June 19th,
23  1991?
24    A   When I Like It, I Love It was recorded in
25  the studio?

1    A   Yes.
2    Q   Were you present at the concert in 1990,
3  when it was recorded.
4    A   No, that was done in Phoenix, Arizona and
5  I was not there.
6    Q   So the only time you were present, when I
7  Like It, I Love It was recorded, it was June 19th,
8  1991?
9    A   Yes.
10    Q   And the only reason that you know it was
11  also recorded in 1990 is that you subsequently heard
12  the recording in Phoenix, in 1990?
13    A   Subsequent, I don't know if that was
14  subsequent.
15    Q   Well, was it on the date, were you present
16  at the concert?
17    A   The concert was in 1990. Well, you know
18  what? It may have been in 1989, I don't know.
19    Q   So sometime after this concert in 1989 or
20  1990 you heard the recording of the Live In Concert
21  CD?
22    A   I heard it.
23    Q   And you don't know when Mr. Hobbs, you
24  said that he created I Like It, I Love It, but you
25  don't know when?

Page 101

1    A   No.
2    Q   You don't have any information that would
3    lead you to make an educated guess when that was?
4    A   No.
5    Q   Let direct your attention back to Exhibit
6    No. 4, and before we get to I Like It, I Love It,
7    let's go back to It's Your Birthday.
8        We had discussed PA 877-745, registration
9    number and let's discuss the other two
10   registrations.
11       The next registration is number PA 890-
12   419, okay.  That says it was registered April 9th,
13   1998, correct?
14   A   Registered?
15   Q   The effective date.
16   A   That's what it says.
17   Q   And that says that it was filed by Lil'
18   Joe Weiner Music, Inc.?
19   A   Yes, sir.
20   Q   And it says here the year in which
21   creation of this work was completed is 1996?
22   A   Yes.
23   Q   Do you know what that date represents?
24   A   The date like was there was a Greatest
25   Hits CD that came out that day.  This is a remix.

Page 102

1    Q   Is that a remix of the same sound
2    recording that was released in 1994?
3    A   I'm not sure.  And the reason I say that
4    is that if we go by, this is what, Exhibit No. 5.
5    The one on the side of the box it has an item where
6    it says reel number 2, Lil' Joe Records, and it
7    says, you know, It's Your Birthday as one of the
8    titles and then it says 8-7-96 and also shows on
9    part of the box it says that's the same thing.
10   Q   And that concludes or leads you to
11   conclude what?
12   A   It says the producer was David Hobbs so it
13   leads me to believe David Hobbs came up with a
14   different version of It's Your Birthday.  Like on
15   this page here is a little different version.  So I
16   have no idea.  I'd have to listen to this CD.
17   Q   Do you know whether or not the phrase, Go
18   blank, it's your birthday, appeared in the appeared
19   in the first version of It's Your Birthday in 1994
20   as opposed to the subsequent version that may have
21   been created by David Hobbs?
22   A   I'm not certain but, you know, I can, it's
23   both in versions.  I think it's in both versions.
24   Q   And just by listening to the publicly
25   released CD you would be able to answer that

Page 103

1    question?
2    A   Right.
3    Q   All right, the third registration is PA-1-
4    072-403, effective date of the registration is 3-10-
5    2000, is that correct?
6    A   Right.
7    Q   And that one is entitled Luke, It's Your
8    Birthday Bonus Mix XR256, clean?
9    A   Yes.
10   Q   And is this the year that that particular
11   version of the song was publicly released?
12   A   Yes.
13   Q   And that was another version that you
14   released?
15   A   This one has clean lyrics.  The other two
16   that you discussed did not have clean lyrics.
17   Q   And the phrasing, Go blank, it's your
18   birthday, would be in this version as well?
19   A   As far as I know, yes.
20   Q   Are these the only three registrations
21   that Lil' Joe Wein or anyone else has filed?
22   A   Yes, PA-wise, yes.
23   Q   By the way you're not claiming in this
24   lawsuit that anyone has infringed the sound
25   recordings of the copyrights of yours are you?

Page 104

1    A   No, I'm not.
2    Q   I'm sorry, you're not?
3    A   No, I'm not.
4    Q   Sometimes the record is unclear, I just
5    want to make sure you're not?
6    A   I thought I said I'm not.
7    Q   I'm just trying to get a clean record.
8        So is it correct you're not claiming any
9    infringement of any sound recordings?
10   A   That's correct.
11   Q   The other registration in Exhibit 4 of
12   this document here are for I Like It, I Love It and
13   I think there are five of them?
14   A   No, three.  They're continuations of
15   pages.
16   Q   Okay.  Let's start with the first one in
17   order.  And that one would be PA-881-642, title of
18   the work I Like It, I Love It parentheses (XR116.)
19   What is the XR116?
20   A   It indicates that it came from Sports
21   Weekend Album Two.
22   Q   That's a catalog number?
23   A   Yes, a catalog number.
24   Q   Again when you indicated that the work was
25   completed in 1991 that is simply when it was first

Page 105

1  released?
2      A   Yes.
3      Q   You have no information one or another
4  when Mr. Hobbs created this song?
5      A   No.
6      Q   It is unlike the case of Mr. Campbell, you
7  are not familiar with the way Mr. Hobbs worked to
8  make a determination as to how long before the
9  recording date he wrote the song?
10     A   No.
11     Q   It could be days, it could be weeks, it
12  could be years --
13     A   Yes.  Your statement is correct.
14     Q   Then the next registration is PA 855-147
15  for I Like It, I Love It.
16         By the way there are three authors or four
17  authors of I Like It, I Love It.  There's Luther
18  Campbell, there is Chris Wong Wa, there is Mark Ross
19  and David Hobbs.
20     A   Right.
21     Q   Were you also assuming that David Hobbs
22  was the one who wrote this song?
23     A   I'm not assuming that.
24     Q   Could you elaborate?
25     A   The four of them, when they came to this

Page 106

1  album it was made at a point because the four of
2  them were having some difficulties with each other
3  and all of the songs they deemed would be from all
4  four of them that they collaborated on the song.
5      Q   In other words, you're suggesting that not
6  all of them were actually involved in writing these
7  songs but they agreed that they would all be deemed
8  co-authors?
9      A   Yes.
10     Q   What is the basis for your contention, if
11  you are making such a contention that David Hobbs is
12  the one who wrote this song?
13     A   David Hobbs came up with all these ideas
14  for all the songs.
15     Q   On that album?
16     A   On every album.
17     Q   Every 2-Live Crew album --
18     A   Him or Michael Stirling, you know, on the
19  earlier ones they would come in with an idea, they
20  would have a meeting with the four of them and then
21  they would say, okay, we'll do that song and we
22  won't do that song or no, I don't like that idea.
23  You know, they'd have a meeting amongst the four of
24  them and narrow down the list that they were going
25  to create you know, further stuff from it.

Page 107

1      Q   And based upon that practice you're
2  assuming that there was a meeting of that nature for
3  I Like It, I Love It?
4      A   I saw it, I saw them tape this.
5      Q   You were present then?
6      A   I was not present in the meeting.  I saw
7  all four people actually go into an office, meet for
8  a couple of hours, then come out.  I know that it
9  was in particular this album.
10     Q   And where did that meeting take place?
11     A   Luther Campbell's office at 8400 Northeast
12  Second Avenue on the second floor in a big office in
13  the back part of the building.  It was partly in his
14  office, Luther Campbell's office and partly in
15  another office.  This meeting took place.
16     Q   What year was that?
17     A   1990.
18     Q   How do you know I Like It, I Love It was
19  discussed in that meeting?
20     A   They discussed all of the songs.
21     Q   But how do you know I Like It, I Love It
22  was not composed -- well, do you know if it was
23  composed prior to that meeting?
24     A   I have no idea.
25     Q   So it could have been that night, or might

Page 108

1  not have been that night.  You're not sure?
2      A   I have no idea one way or another.
3      Q   I think I'm a little bit lost as to what
4  the significance of the meeting is where you said
5  David Hobbs would come up with the ideas for any
6  records?
7      A   Well, as I said, in initial sets the ideas
8  would go into, you know, a meeting where all four of
9  them, you know, meaning Luther Campbell, Mark Ross,
10  David Hobbs, Chris Wong Wa.  They would discuss the
11  ideas that they had back and forth as to what, you
12  know, songs would appear on an album or whether or
13  not something else was going to take place at those
14  meetings I couldn't tell you what else took place.
15  I was not present in those meetings.
16     Q   In the meeting you're talking about, the
17  meeting to decide essentially was going to be
18  contained on a particular album, this album of live
19  in concert, you're not suggesting that I Like It, I
20  Love It was created in that room?
21     A   I have no idea one way or another.
22     Q   You weren't in the room?
23     A   I wasn't at the meeting.
24     Q   You were in the building?
25     A   I saw the meeting take place.

Page 109

1     I saw through the glass, you know, I saw
2  four people go into the room, then they were in
3  there several hours other than to come in and out to
4  go to the bathroom and go back in.
5     Q   But you couldn't hear what was going on in
6  the meeting?
7     A   No.
8     Q   Was there any transcript of the meeting?
9     A   No.
10    Q   Was there any recording of the meeting?
11    A   No.
12    Q   Was there any videotape of the meeting?
13    A   No.
14    Q   Did anyone take notes of the meeting?
15    A   No.
16    Q   Would there be any documentation
17 reflecting what happened in this meeting other than
18 what any of these particular people may have said at
19 that time?
20    A   I don't know.
21    Q   You've never seen it?
22    A   I was supposed to receive some notes, you
23 know, when I received all the albums, you know, all
24 the assets like from Luke Records, but I never
25 received anything.  So I'm assuming they don't

Page 110

1  exist.
2     Q   Beyond watching this meeting begin and end
3  you don't have any personal knowledge how I Like It,
4  I Love It was created?
5     A   No.
6     Q   And you have no idea whether the term I
7  Like It, I Love It was an original phrase to Mr.
8  Hobbs?
9     A   No.
10    Q   No, you don't know?
11    A   No, I don't know.
12    Q   And you have no idea whether they may have
13 gotten that term from some pre-existing use?
14    MR. WOLFE:  Object to the form.
15    THE WITNESS:  I have no idea where they
16    got it from.
17 BY MR. GOLDMAN:
18    Q   I am still a little bit confused as to how
19 did you know that David Hobbs was the one that
20 actually wrote "I Like It, I Love It" as opposed to
21 anybody else?
22    A   I'm not saying that he did.  I'm saying
23 that the initial ideas for any album came from David
24 Hobbs or when Michael Stirling was there, came from
25 Michael Stirling and David Hobbs.

Page 111

1     Q   So if in fact, David -- well, let me ask
2  it this way.
3     You don't know which of the four writers
4  was responsible for "I Like It, I Love It" to be
5  created?
6     A   No.
7     Q   It could have been any of the four or any
8  combination of the four?
9     A   That's correct.
10    Q   And if it was Luther Campbell then it most
11 likely, as to the way he created things was created
12 on the night of June 19th, 1991?
13    A   Again, there are two songs, that you know,
14 are -- there is I Like It, I Love It and there is
15 Sex, I Like It, I Love It.
16    I now the Sex, I Like It, I Love It took
17 place at a live concert before they did the live
18 concert there was a prerecorded soundtrack and
19 everything else got cleaned up.  I know they had a
20 meeting in Luther Campbell's office building to
21 decide what was going to take place on their
22 concert, you know, what was going to be recorded.  I
23 think that they talked about that.
24    Q   By that you mean you're referring to two
25 meetings?

Page 112

1     A   I was referring to one that occurred
2  before Sex, I Like It, I Love It and then I Like It,
3  I Love It meeting was in 1991.  That took place
4  before --
5     Q   Wait a second.  You're saying the I Like
6  It, I Love It meeting in 1991 took place before they
7  commenced recording?
8     A   That was before the Sports Weekend as to
9  whether they wanted it to be part of the album, too.
10    Q   And the meeting we talked about five or
11 ten minutes ago was a second meeting?
12    A   Right.  We're talking about both meetings
13 took place on two different dates with the same
14 procedure.
15    Q   So the testimony you gave us about a
16 meeting was the same for both meetings, you saw them
17 go in the room, come out of the room --
18    A   Right.
19    Q   -- and you have no further knowledge --
20    A   I don't know the exact date of the
21 meeting, I don't know, you know, the hours or
22 anything else.
23    Q   And, essentially, the I Like It, I Love It
24 registration, the one that is attached as part of
25 Exhibit 4 PA 898-892 with the E30003 is the catalog

Page 113

1  number?
2      A    Catalog number.
3      Q    And the concert was in 1990 and the album
4  was released in 1990, is that what you're saying?
5      A    That's the date of the album.
6      Q    You're talking about November 14th, 1990?
7      A    That's right.
8      Q    Again, let me apologize for repeating
9  myself, but I just need to clarify.
10         You don't know how long before that live
11  concert in 1990, I Like It, I Love It or Sex, I Like
12  It, I Love It was written?
13     A    I have no idea.
14     Q    It could have been spontaneously at that
15  live concert?
16     A    No, I doubt it.
17     Q    Why do you say that?
18     A    Because if you listen to the CD, you know,
19  as far as the recording it was a call & response
20  recording and that would appear to me from that,
21  since the crowd knew what the words were that this
22  had been done in many other concerts previously and
23  had become like a commonly known song of 2-Live
24  Crew.
25         Even though it wasn't on the CD, if you

Page 114

1  listen to the live concert album you'll hear the
2  call & response, you know, people in the group going
3  "I like it," and then the crowd going "I love it."
4      Q    Were there other call and response chants
5  on that album?
6      A    Yes.
7      Q    The whole album consisted of that?
8      A    No, a lot of it, several songs in it.
9      Q    What were some of the others?
10     A    I believe in the song Face Down, Ass Up.
11     Q    Any others?
12     A    There may have been a call & response in
13  portions of a song called We Want Some Pussy.
14     Q    Any others?
15     A    I don't recall what else was on that CD.
16     Q    How do you know that I Like It, I Love It
17  wasn't known by the crowd because other people had
18  performed that same call & response in concert?
19     A    It's obvious from listening to the
20  recording, because the record wasn't edited or
21  anything, that the crowd responded exactly on cue.
22  I believe, you know, unless somebody was holding up
23  cue cards or you know, for people to say the words
24  they knew them from seeing the group perform it.
25     Q    But my question is how do you know the

Page 115

1  crowd didn't know that from seeing other people
2  perform that call & response?
3      A    I am not aware of any other person
4  performing that call & response.
5      Q    Has all the work you have done in the
6  music industry been related to the rap industry?
7      A    Well, I did some R & B.
8      Q    So rap and R & B?
9      A    Right.
10     Q    No other genre?
11     A    I don't think so.
12     Q    Would you say you're pretty familiar with
13  the rap industry?
14     A    I am familiar with what goes on, yes.
15     Q    And if there were prior uses "I Like It, I
16  Love It" or "Go Blank It's Your Birthday," you would
17  be aware of this?
18     A    Yes.
19     Q    And you're not aware of any?
20     A    No.
21     Q    Have you ever spoken to Luther Campbell
22  about the creation of It's Your Birthday?
23     A    Probably.
24     Q    Do you recall any of those conversations?
25     A    Specifically, no.

Page 116

1      Q    Do you recall generally what you discussed
2  with him?
3      A    Probably, it was, if when I was in the
4  studio, you know, I was part of the conversation, I
5  don't think it was a probably conversation with me
6  and him.
7      Q    Have you ever discussed with Luther
8  Campbell the originality of the phrase Go Blank It's
9  Your Birthday?
10     A    Not particularly that phrase, no.
11     Q    Are you making a distinction between that
12  conversation or conversations like that and having a
13  conversation with somebody about something more
14  general?
15     A    Well, what happened with these records,
16  after starting in and around the time of the
17  Atlantic deal, the Atlantic recording deal, you
18  know, prior to that period of time there was a lot
19  of recordings that were released.
20         For example, the Stanley Kubrick phrase,
21  Me So Horny, you know, that had not been cleared.
22  It was pretty, it was made pretty clear by Atlantic
23  Recording people that we would not -- they wanted
24  all samples after an album took place. They wanted
25  a discussion in which, you know, this is where I was

Page 117

1  present where all songs were gone through and that
2  there would be a discussion as to what needed to be
3  cleared as to, you know, whether we were sampling
4  someone or whether anything was taken from someone
5  else that needed to be addressed. So on these songs
6  there's nothing that took place regarding that,
7  whereas on other songs on these albums there were
8  numerous samples that we took, you know, by Luke
9  Records employees and professionals.
10     Q   Was that a dispute with somebody over Me
11  So Horny?
12     A   Yes.
13     Q   Who was that?
14     A   Two different people, Warner Brothers
15  filed some for using portions of the Full Metal
16  Jacket phrase, me so horny, and from the sounds,
17  firecracker recording by mass production by the
18  writers and Ricardo Williams and the owner of the
19  master and publishing Ed Ellerby.
20     Q   This was Stanley Kubrick?
21     A   Warner Brothers Films.
22     Q   Did they make a claim that was resolved or
23  was there a lawsuit?
24     A   I believe ultimately there was a lawsuit
25  because Luther Campbell didn't pay what he was

Page 118

1  supposed to pay at the time, you know, and then
2  Warner Brothers filed a lawsuit.
3     Q   Was that ultimately settled?
4     A   Yes.
5     Q   That lawsuit was filed against Luther
6  Campbell, Atlantic Records, or both?
7     A   I think that was prior to the Atlantic
8  Records deal.
9     Q   So Me So Horny was an instance where
10  Luther Campbell created a song by adopting a
11  difference phrase that already was in the public
12  domain?
13     A   Yes.
14     Q   What were the other complaints, they
15  claimed ownership of something?
16     A   The music.
17     Q   You mean relating to the lyrics?
18     A   The music was sampled.
19     Q   The music was sampled and the procedure
20  changed when they went to Atlantic Records around
21  that time period going forward where everything got
22  cleared because there were discussions I had with
23  people about lot -- you know, that it would be a lot
24  cheaper to clear these things before you put the
25  record out than you clear them afterwards.

Page 119

1     Q   What was the procedure that was used after
2  that, after Me So Horny and that dispute to
3  determine whether there was a sample or other things
4  were on the album that had to be cleared?
5     A   Well, I would be present in a meeting
6  with, you know, the producer of a particular album
7  and in the case of I Like It, I Love It or Sex, I
8  Like It, I Love It, it would be, you know, David
9  Hobbs with Luke Records employees, one in particular
10  by the name of Frank Tobino along with Luther
11  Campbell in some cases he would be at the meetings.
12        We would go through, you know, and there
13  would be a list made of things and then Frank --
14  Frank would contact Luke's Entertainment attorney
15  who would get involved with, you know, helping to
16  resolve and negotiate what needed to be done.
17        And then the performers were all listed,
18  all the samples they used and that started around
19  1990.
20        Then at that time is when we started to
21  have meetings because everybody in 2-Live Crew, the
22  other members were beginning to become very upset
23  that they were not receiving the royalties that they
24  felt they should get, because it was charged back
25  because of all these claims and lawsuits and

Page 120

1  settlements. So it was not only because of Atlantic
2  Records, but the members of the group insisted that
3  they start being cleared because they weren't going
4  to continue to do all the work and then all of the
5  money from the recording sales would go to
6  different, you know, to keep -- to pay for the
7  claims because the material was not being cleared.
8     Q   What type of samples were used on these
9  records?
10     A   What do you mean?
11     Q   Well, were these samples of sound
12  recordings?
13     A   Sound recordings.
14     Q   They weren't any interpolations of the
15  sound recordings?
16     A   Yes, they were interpolations.
17     Q   The ones we're talking about, Me So Horny?
18     A   Yes and then Pretty Woman, that was a
19  parody, the sound recording was used or something
20  similar --
21     Q   Do you know what an interpolation is?
22     A   Yes.
23     Q   And the claim for Warner Brothers was
24  actually the actual piece of the movie soundtrack
25  was used?

Page 121

```
1     A    Yes.
2     Q    Not just the words?
3     A    Yes.
4          There were also meetings because there
5   were parody songs Luke started to do on different
6   albums, on the Free To Live there was a parody of a
7   big country western song and the name of it was --
8   Luke's song was called I Left My Heart At The Rolex
9   or something or the girl at the rolex, which was a
10  black strip club in Miami.
11    Q    So for songs which you described that
12  parody no licenses were obtained by --
13    A    When the lawyer, the entertainment lawyer
14  would make a determination whether or not a license
15  needed to be obtained, you know, all this
16  information was given to the lawyer.
17         But the parody was, you know, I Left All
18  My Ex's In Texas or --
19    Q    Or All My Ex's Live in Texas?
20    A    Yeah, I think Luke's song was all my Ex's
21  live or work in the Rolex.
22    Q    Have you ever discussed with any co-
23  writers of I Like It, I Love It, the creation of
24  that song?
25    A    No.
```

Page 122

```
1     Q    Do you know if Luther Campbell believes
2   that phrasing of Go Blank, It's Your Birthday is
3   original to him?
4     A    I don't know anything that he believes.  I
5   really have had much discussions with him.
6     Q    Would it surprise you if he contended that
7   it not original to him?
8     A    No, it would not surprise me.
9     Q    Why not?
10    A    Because he specifically told Michael
11  Stirling and myself in meetings that we had with him
12  that he was going to make sure I collected nothing
13  from this lawsuit.
14    Q    When did he tell you that?
15    A    Back in, let's see, Michael met the him
16  over a period of time, maybe April of this year, May
17  of this year.
18    Q    So Mr. Stirling met with Mr. Campbell --
19    A    Yes --
20    Q    -- and that's when Mr. Campbell made the
21  statement --
22    A    He also told me.
23    Q    When did he tell you that?
24    A    Prior to that.
25    Q    Prior to that meeting?
```

Page 123

```
1     A    Prior to the meeting that he had with
2   Michael.
3     Q    On the same day?
4     A    Around the same day.
5     Q    April 2006?
6     A    April, May.
7     Q    What was the context of that meeting?
8     A    I'm not one of his most favorite people I
9   guess so that was the context of the meeting.
10    Q    Have you threatened to sued him?
11    A    Yes.
12    Q    For what reason?
13    A    Well, I threatened to sue him and Michael
14  threatened to sue him.
15    Q    Why?
16    A    Well, Michael had two clients of his that
17  did work on Luke's current album that Luke didn't
18  pay.
19    Q    What about yourself?
20    A    He also brought up my situation with Luke
21  as well.
22    Q    Which was what?
23    A    The numerous songs that were used that he
24  had yet to pay for.
25    Q    Used in what context?
```

Page 124

```
1     A    Some he did re-recordings of supposedly
2   and some he actually sampled the actual song.
3     Q    Is this for a current album?
4     A    The album is called My Life & Freaky
5   Times.
6     Q    Has it been released?
7     A    Yes, it has been.
8     Q    When was it released?
9     A    The date was May 16th.
10    Q    What year?
11    A    I think it's on Luke Records label through
12  your Band Box Office which is through BMI.
13    Q    And you're in the midst of a dispute with
14  Mr. Campbell right now?
15    A    Yes.
16    Q    And if Mr. Campbell says the phrase is not
17  original to him, do you have any reason to believe
18  he's not telling the truth?
19    A    Yes.
20    Q    What's the reason?
21    A    Well, you know, we had all these
22  discussions about things not being original to him
23  that needed to be cleared and he told me, you know,
24  in conversations that took place back in 1994 when
25  the album was being made --
```

Page 125

1    Q    Contemporaneously?
2    A    Right, you know, that these things didn't
3  need to be cleared.  I asked him if and he told me
4  they didn't.
5    Q    Well, there's a possibility also that the
6  material may have been in the public domain and he
7  wouldn't need to have it cleared, because it
8  wouldn't have been original, is that correct?
9    A    I have no idea.
10   Q    Do you know what the public domain is?
11   A    I know what it is.
12   Q    Would you agree that if materials are in
13  the public domain, it's not original and does not
14  have to be cleared?
15   A    I think maybe that's part of what this
16  lawsuits is about, that's what your contention is.
17   Q    But you would agree with me, you would
18  agree with my statement then that if it's in the
19  public domain, and it's not copyrightable, it
20  doesn't have to be cleared?
21   A    Public domain material does not have to be
22  cleared.
23   Q    So, if Mr. Campbell thought he was simply
24  using something that was around for a long time and
25  didn't belong to anybody, he wouldn't disclose it to

Page 126

1  you, even if it wasn't original?
2        MR. WOLFE: Objection, it calls for
3    speculation, assumes facts not in evidence.
4    You can answer if you can.
5        THE WITNESS: He was pretty much -- you
6    know, he came up even with the parody stuff, he
7    would raise questions.  He was very inquisitive
8    at the time.  You know, he was getting tired of
9    spending a great deal of money on attorney's
10    fees, you know, with all these different
11    lawsuits and songs.  So he would ask a lot of
12    questions.
13   Q    He never told you Go Blank was
14  original to him --
15   A    He never told me it wasn't.
16   Q    He never told you it was --
17   A    Well, the inference by him telling me
18  that it didn't need to be cleared, then it
19  would be original as far as I was concerned.
20   Q    But he never told you --
21   A    He told me it didn't need to be
22  cleared --
23   Q    But he never said to you it was
24  original to him?
25        MR. WOLFE: I think you're badgering the

Page 127

1  witness.  He answered it already for you.
2        MR. GOLDMAN: I don't think so, but let me
3    try again.
4        THE WITNESS: He didn't -- if your
5    question --
6        MR. WOLFE: There's no question pending
7  BY MR. GOLDMAN:
8    Q    He never said to you that phrase, Go
9  blank, it's your birthday, was original to me Luther
10  Campbell?
11   A    That specific conversation did not take
12  place.
13   Q    So the only thing he did was he did not
14  tell you that it was not original to him, it needed
15  to be cleared?
16        MR. WOLFE: He's answered, the question
17    has been asked and answered three times.
18        THE WITNESS: I think I've answered that.
19        MR. GOLDMAN: Answer it again.
20        MR. WOLFE: He doesn't have to answer it
21    again.
22        MR. GOLDMAN: Are you instructing him not
23    to answer --
24        MR. WOLFE: Move on, counsel --
25        MR. GOLDMAN: Are you instructing him not

Page 128

1  to answer the question --
2        MR. WOLFE: I think you're badgering the
3    witness.  He's answered the question so move
4    on.
5        MR. GOLDMAN: I'm not going to move on
6    unless you instruct him not to answer the
7    question.
8        MR. WOLFE: I believe he said I've
9    answered the question.
10        THE WITNESS: I believe I've answered it.
11        MR. GOLDMAN: Are you going to answer the
12    question or are you going to instruct him not
13    to answer.
14        MR. WOLFE: He's answered the question,
15    three, four or five times --
16        MR. GOLDMAN: Why don't you instruct him
17    and then we can go to the judge and we'll see
18    what the judge says.
19        MR. WOLFE: I'm not instructing him on
20    anything.  He said he answered the question.
21    He's satisfied with his answer, he has nothing
22    further to add.
23        MR. GOLDMAN: Why don't we have the
24    question read back and you can instruct him not
25    to answer and then we can go to the judge.

Page 129

1     MR. WOLFE: Please read back the question.
2     [Thereupon, the court reporter read back
3  the question as previously recorded.]
4     MR. WOLFE: I have a third objection as to
5  the form.
6     MR. GOLDMAN: Can you answer the question?
7     THE WITNESS: I think I've answered it
8  already.
9     MR. GOLDMAN: All right. Let's start all
10  over.
11     MR. WOLFE: You know, I'm going home. I
12  feel horrible. I'm feeling very badly.
13     MR. GOLDMAN: I don't care, if you're
14  going to adjourn this you're going to be paying
15  my fees to come back here.
16     I'm sorry you're sick, but, you know, we
17  have a seven hour deposition and I'm going to
18  take up the whole seven hours.
19     MR. WOLFE: I told you that I was not
20  feeling well and I wanted to cancel the
21  deposition today. Now, I'm feeling as bad as I
22  can feel and I'm doing the best that I can.
23  But we're not staying real late because I'm
24  going home sick.
25     MR. GOLDMAN: I'm sure you have other

Page 130

1  people in your office who could fill in for
2  you --
3     MR. WOLFE: I don't have anyone here that
4  can fill in for me.
5     MR. GOLDMAN: I'm entitled to a seven-hour
6  deposition and if you end early you're going to
7  pay me to come back to complete it --
8     MR. WOLFE: That's not the case.
9     MR. GOLDMAN: I'm just trying to get an
10  answer to my question.
11     MR. WOLFE: Really, I really don't like
12  your attitude, I think you're starting to
13  badger the witness.
14     And counsel, I told you when you came here
15  today that I was sick and I don't feel well and
16  I would see what would happen.
17     I'm sick, I'm sitting here. Now, if you
18  want to go to court and say counsel was sick, I
19  forced him to sit here, then you go ahead and
20  do that and go to the court.
21     And I'll go after you for sanctions. So
22  we're doing the best we can to get this done
23  and I was trying to stay here, I'm not feeling
24  good, I wanted to go home.
25     If I get worse this deposition is going to

Page 131

1  end and we'll come back another time.
2     Now, we're going to take a recess.
3     [Thereupon, a short recess was taken.]
4  BY MR. GOLDMAN:
5     Q  Let's start over.
6     Tell me again what the basis of your
7  contention is that Go Blank, It's Your Birthday is
8  original to Luther Campbell?
9     A  Starting in 1990, when Atlantic Records
10  was having a deal, in the middle of the year when
11  that deal was done, contemporaneously with Luther
12  Campbell having trouble with David Hobbs which
13  started in 1990, you know, when the Atlantic Records
14  deal was done and contemporaneous with the contract
15  renegotiation with the other 2-Live Crew, Dave Hobbs
16  and Mark Ross and Chris Wong Wa, if there was any
17  question or any doubt on any song issue we would
18  discuss it and that was done if there were music
19  samples used or phrases or if they were any
20  questions whatsoever about them, the things were
21  brought up. For example in Banned In The USA, there
22  was a question about Born In The USA with Bruce
23  Springsteen so we went back to the lawyer, and who
24  represented Bruce Springsteen at that time about
25  getting the right to use the melody line to do the

Page 132

1  song Banned In The USA. So whenever there was a
2  question whatsoever that was raised a decision was
3  made by legal counsel that was present at the
4  meeting as to whether or not something had to be
5  cleared.
6     And Luther Campbell wanted to basically
7  the shift the onus of responsible on some of these
8  lawsuits and it escalated so -- it escalated the
9  fees and costs to the professionals. In other
10  words, he wanted to go after these persons for
11  malpractice.
12     Q  So you're saying that every time he
13  disclosed that a sample had been used something had
14  to be cleared and that meant that money was going to
15  come out his pocket?
16     A  That's correct.
17     Q  So it was in his interest at least not to
18  disclose that?
19     A  It was in his interest at that time to
20  clear every single thing because he was going to
21  take money out of these people's pockets, anyhow,
22  you know, 2-Live Crew album, the money came out of
23  the producer's royalties and the artist royalties
24  and he at that point wanted to clear everything and
25  not have a dispute among these groups, these members

Page 133

1 as to why their royalties were lower among him and
2 his other producers. You know, in the case of the
3 song on the solo album he cleared everything that
4 needed to be cleared.
5     Q   But Luther Campbell never told you that Go
6 Blank, It's Your Birthday was original to him and he
7 never told you that Go Blank, It's Your Birthday was
8 not an original thing.
9     A   All I can tell you is that at that point
10 in time, 1990, 1991, 1992, 1993, 1994, Luther
11 Campbell and all of the members we would have
12 meetings where everything and everything was
13 discussed. And if there was a question, any
14 question in anybody's mind as to whether something
15 needed to be cleared there would be a discussion
16 about everything from soup to nuts.
17     MR. GOLDMAN: Move to strike.
18 Nonresponsive to the question.
19     If you read the question back I believe it
20 was a yes or no question.
21     MR. WOLFE: I think he's answered the
22 question at least eight times already.
23     MR. GOLDMAN: I've not gotten an answer to
24 the question and until I get an answer to the
25 question I'm going to keep asking it.

Page 134

1     MR. WOLFE: You got an answer to the
2 question, you just don't like the answer,
3 that's too bad.
4     MR. GOLDMAN: I didn't get an answer to my
5 question.
6     Let me have the question read back.
7     [Thereupon, the court reporter read back
8 the previous question.]
9     THE WITNESS: Specifically I don't recall
10 that question being asked.
11 BY MR. GOLDMAN:
12     Q   You have no notes or documents that would
13 reflect whether he ever made that statement, whether
14 it was original to him or not original to him?
15     A   No.
16     Q   Let's mark as the next Exhibit No. 8.
17     Do you recognize this document?
18     [Thereupon, the aforementioned document
19 was marked as Defendant's Exhibit No. 8 for
20 Identification.]
21     THE WITNESS: Yes.
22 BY MR. GOLDMAN:
23     Q   You actually signed this document, is that
24 correct, on page 12?
25     A   Yes.

Page 135

1     Q   This actually says page 12, maybe it's out
2 of order, but you signed this document correct?
3     A   Yes.
4     Q   And you read it before you signed it?
5     A   Yes.
6     Q   And you were satisfied with the answers
7 that were given that they were accurate to the best
8 of Lil' Joe Wein Music, Inc.'s ability?
9     A   Yes.
10     Q   I direct your attention to the Answer to
11 Interrogatory No. 1, and Interrogatory No. 1 asked
12 for the plaintiff to, quote, state all facts that
13 support your contention that the defendants have
14 infringed your copyright in the musical composition
15 "It's Your Birthday," also known as "It's Your
16 Birthday Bonus Remix" and in response --
17     MR. WOLFE: Which one are you talking
18 about?
19     MR. GOLDMAN: Interrogatory No. 1.
20     In response you referred or refer us to
21 see report of Judith Finell, F-i-n-e-l-l?
22     THE WITNESS: Yes.
23 BY MR. GOLDMAN:
24     Q   Is there anything else other than the
25 words, see report of Judith Finell?

Page 136

1     A   It also says see Plaintiff's Complaint and
2 the songs "In Da Club" are substantially similar to
3 It's Your Birthday.
4     Q   And when you say substantially similar,
5 what portions is it like. go shorty, it's your
6 birthday --
7     A   Well, you know, I don't remember the
8 words, you know, it says go shorty, go Sheila, it's
9 your birthday, you know, it's the interchanging of
10 names. When you have stuff like that I don't know,
11 it's more the go in the combination of chants, go go
12 go than Sheila it's your birthday or this one it's
13 your birthday, you know, I don't know the words of
14 the song by the heart the similar seems to be the
15 use like, you know, one word is changed in the
16 pattern.
17     MR. GOLDMAN: Let me have this marked as
18 Exhibit No. 9.
19     [Thereupon, the aforementioned document
20 was marked as Defendant's Exhibit No. 9 for
21 Identification.]
22 BY MR. GOLDMAN:
23     Q   Do you recognize Exhibit No. 9?
24     A   Yes.
25     Q   What is it?

Page 137

1     A   It's the lyrics.
2     Q   To what?
3     A   To I Like It, I Love It and It's Your
4 Birthday.
5     Q   Do you know how this was created?
6     A   I believe it's a copy of the lyrics from
7 our office.
8     Q   Do you know how they came to be typed up?
9     A   I don't know who typed them.
10    Q   But they were in your files?
11    A   Do you know if they are an accurate
12 reflection of the lyrics of these compositions?
13    A   I think they are.
14    Q   And if you turn to the sixth page of the
15 document where it's talking about the lyrics from
16 It's Your Birthday.
17    A   Okay.
18    Q   The material in this lyric you say are
19 substantially similar to the lyrics "In Da Club" or
20 which one?
21    A   Well, you have to look at the song, so
22 let's look at the third paragraph, the middle of the
23 third paragraph where it says, go Derek it's your
24 birthday, go Derek it's your birthday, go Freddy go,
25 go, go, Freddy it's your

Page 138

1 birthday, it's your birthday, go Derek, go, go, go,
2 go Tracy, it's your birthday, it's your birthday:
3 go, go, go, go Red, go, go, go, go, go, go, go, go,
4 go, go, go, go, go, go, go --
5        It's stuff like that and then when you go
6 down and you skip a paragraph there's a similar
7 paragraph, in the last paragraph where it says
8 Scorpio, it's your birthday, Pices, it's your
9 birthday, go, go, go, go, go, go, it's your
10 birthday --
11    Q   What page are you on?
12    A   On the same page.
13        And then on the last page, you know, it's
14 the same thing.
15    Q   You know other than reading each
16 individual paragraph which is going to be
17 unbelievably difficult for the court reporter, what
18 I'd like you to do is mark the sections where you
19 can put brackets around the sections you claim are
20 an infringement.
21        Here you go, it's a highlighter.
22        Taking a look at what parts you marked
23 with a pen on the left margin of the exhibit --
24    A   And one portion on the right margin also.
25    Q   Let me ask you a question.  What is the

Page 139

1 distinction that you are drawing between the parts
2 you marked in this third paragraph and the parts in
3 the same paragraph that you did not mark.  For
4 example, where it says Shiela it's your birthday, go
5 Sheila it's your birthday, go Freddy it's your
6 birthday, go Freddy it's your birthday you didn't
7 mark those portions?
8     A   The similarities to me are not necessarily
9 that.  It was the go go go more than the one go.
10    Q   So the it's your birthday, although go,
11 Sheila or Go Freddy is like what 50 Cent did In Da
12 Club?
13    A   Well, the other items area a little bit
14 more specifically similar.
15    Q   Let me ask you this.  You would not have
16 sued if the only similarity was, go Sheila or go
17 Freddy or go Annette, it's your birthday or go
18 Shorty?
19    A   I don't know.  I would have to ask Mr.
20 Wolfe or Ms. Finell.
21    Q   In your opinion that would not be
22 infringement?
23        MR. WOLFE:  Objection, he's not an expert.
24        THE WITNESS:  I'm not going to give an
25 opinion.

Page 140

1        MR. GOLDMAN:  I think you already did.  I
2 think you answered that question.
3        THE WITNESS:  I'm not saying I wouldn't or
4 I would, just only --
5        MR. GOLDMAN:  Are you saying you don't
6 have an opinion whether it's go Shorty, it's
7 your birthday infringes or go Sheila, it's your
8 birthday --
9        THE WITNESS:  I think I answered that I
10 would speak --
11        MR. WOLFE:  Hold on.  He told you he'd
12 speak with his lawyer or his expert and make a
13 decision.
14 BY MR. GOLDMAN:
15    Q   Apart from speaking with your lawyer or
16 the expert witness do you have any opinion?
17    A   I told you I would have to contact Ms.
18 Finell or Mr. Wolfe.  I'm not saying I would not,
19 you know, however, a whole series of people have
20 already told me they felt that this was like lifted
21 off of a Luke song.  And those surrounding facts and
22 circumstances were brought to my attention and then
23 I went to Ms. Finell and to my counsel to find out
24 if they felt I had a claim or not.
25    Q   We know what Ms. Finell told you and I

Page 141

1  don't want to know what the lawyer told you, but let
2  me ask you another question.
3      I'd like to you mark the I Like It, I Love
4  It lyrics on Exhibit 9 in the margin that feel or
5  believe are infringed.
6      Okay. I take it you're not marking the
7  sentence "if you all like having kinky sex and that
8  other kind of sex?
9      A   Where --
10     Q   Here.
11     A   No, I'm starting here where it says,
12  say, say, I like it, I love it.
13     Q   Anything else?
14     A   No, nothing else.
15     Q   Is it your position in any portion of the
16  music from I Like It, I Love It, that that has been
17  infringed?
18     A   No --
19         MR. WOLFE:  Wait a minute, wait a
20  minute -- I'm going to object to the form of
21  the question.
22  BY MR. GOLDMAN:
23     Q   Is it your position that any portion of
24  It's Your Birthday --
25     A   You mean the sound recording or the

Page 142

1  musical portion --
2      Q   I'm talking about the musical notes --
3          MR. WOLFE:  I believe that's all covered
4  in the Finell report.
5  BY MR. GOLDMAN:
6      Q   Other than what Ms. Finell said in her
7  report do you contend that anything, any of the
8  melody or any of the musical notes of I Like It I
9  Love It --
10     A   The melody --
11         MR. WOLFE:  Hold on. He's asking you
12  other than what's in the report.
13         THE WITNESS:  I don't recall. I think she
14  covered it in her report.
15         MR. GOLDMAN:  Just to clarify. I know we
16  have Ms. Finell's report and I know what she
17  said in her report but other than what she said
18  in her report do you contend anything else was
19  infringed?
20         THE WITNESS:  No.
21  BY MR. GOLDMAN:
22     Q   So you're essentially adopting her report
23  as your position?
24     A   Yes, sir.
25     Q   And when you say in your responses in

Page 143

1  Interrogatory No. 3. See report of Judith Finell and
2  Plaintiff's Complaint, further portions of the
3  defendant song is substantially similar to I Like
4  It, I Love It, et cetera, et cetera, you're not
5  purporting to be adding anything to what was in Ms.
6  Finell's report?
7      A   Other than I guess, no, I guess not, no.
8      Q   In other words, you weren't adding
9  substantial and similar other than what was
10  disclosed in Ms. Finell's report?
11     A   Could I ask Richard something?
12         MR. GOLDMAN:  I do mind this time.
13         MR. WOLFE:  Just answer the question.
14         THE WITNESS:  There was a CD that 50 Cent
15  song that he did with Tony Ya Yo in 2001, 2002,
16  called Face Down, Ass Up, which he referred to
17  coming from New York to hang out with Luke on
18  South Beach and going to various clubs and
19  frigging girls.
20  BY MR. GOLDMAN:
21     Q   That is an issue as to access, is that
22  what you're getting at on that song.  You're
23  contending that 50 Cent had indicated that he had a
24  familiarity with Luther Campbell --
25     A   Yes.

Page 144

1      Q   -- and then that he had access to the
2  plaintiff's songs --
3      A   I don't know if you mind, I have the CD,
4  you know, and I could show it to you, the 50 Cent
5  song which was called Face Down, Ass Up.
6      Q   I have no problem if you have it --
7      A   I can go to his office --
8      Q   I don't care, the more stuff I have the
9  happier I am.
10         [Thereupon, a short recess was taken.]
11         MR. GOLDMAN:  All right. Now you've
12  handed me a homemade CD that says 50 Cent Tony
13  Ya Yo Face Down Ass Up.
14         THE WITNESS:  Yes.
15  BY MR. GOLDMAN:
16     Q   This is something you recorded?
17     A   No, it came from Line Wire.
18     Q   You downloaded this from Line Wire?
19     A   No --
20         MR. WOLFE:  What's Line Wire. I never
21  heard of it --
22         THE WITNESS:  It was just someone who
23  works for me --
24         MS. STETSON:  You shouldn't be using Line
25  Wire.

Page 145

BY MR. GOLDMAN:

1  BY MR. GOLDMAN:
2      Q   Let me ask you was Face Down Ass Up one of
3  the songs or chants you said appeared on the same
4  album of as I Like It, I Love It?
5      A   Yes.
6      Q   Is it your contention that this release by
7  50 Cent that you got from Line Wire is an
8  infringement of your copyright in Face Down Ass Up?
9      A   I'm not alleging that here --
10     Q   You're alleging that generally?
11     A   I'm saying that it, you know, it's
12  coincidental that a song that's on another 2-Live
13  Crew song happens to be used by 50 Cent mentioning,
14  you know, Luke shows this guy, you know, that he
15  comes down to Miami Beach, South Beach, he comes
16  down from New York to South Beach, goes with Luke to
17  clubs and is friggin girls and it's the lyrics and
18  then I -- if you got a CD player, you know, you
19  could listen to it.
20     Q   Are you aware that 50 Cent or are you
21  familiar with a song by 50 Cent, How To Rob?
22     A   Am I familiar with the song?
23     Q   Yeah, are you familiar with the song where
24  he talks about all kinds of well known people in
25  rapping?

Page 146

1      A   Yes.
2      Q   Are you making a distinction between him
3  referring to other famous people and other songs and
4  him referring to Luther Campbell in this song?
5      A   Am I making a distinction?
6      A   In other words, is there a difference in
7  the way he refers to Luther Campbell and the way he
8  refers to all these other famous people in other
9  songs he may have not met?
10     A   Well, some of it, you know, obviously it
11  shows some kind of bonding with Luther Campbell
12  versus a situation where like he had with Supreme or
13  With Naz or something like that, you know, he had
14  clashes with them.
15     Q   Are you producing this to me --
16     A   You can have it.
17     Q   Is this the only copy --
18     A   I have another copy, you can have it.
19     Q   A moment ago you said there was some other
20  additional information you were giving me to
21  supplement the interrogatories here?
22     A   Well, the address here for Luther Campbell
23  has a typo.  It's 7180, not 7880.
24     Q   Is that his home address?
25     A   Right.

Page 147

1      Q   Okay.  Let me ask you this.  Do you have
2  any information to document or support your
3  contention that this was substantial and similar
4  based upon I Like It, I Love It?
5      A   On the bonus DVD it was included with Get
6  Rich Or Die Tryin' and that's Tryin' without a G,
7  with an apostrophe.  There's a segment in there
8  where 50 Cent is saying that everything in rap is
9  recycled and you can say or he says, you know, what
10  I say, what you say I can say and make it better.
11  He's just bragging about taking other people's
12  stuff.
13     Q   Anything else?
14     A   Well, there are articles in the newspapers
15  that I have seen.  For example in Fort Lauderdale,
16  you know, after I filed the lawsuit there was an
17  article in the Fort Lauderdale Sun-Sentinel that
18  Luther Campbell was quoted as saying that the
19  material was stolen from him before somehow the
20  lawyer in the day he started moving things and he
21  said that I stole everything from him and how people
22  in 2-Live Crew didn't get paid or don't get paid any
23  more for material.
24     Q   Do you remember what paper that was it?
25     A   The Fort Lauderdale Sun-Sentinel.

Page 148

1      Q   Do you know when?
2      A   Around the time the lawsuit was filed.
3      Q   Did you make a copy of that article?
4      A   No, I didn't.  I remember reading it in
5  the paper.
6      Q   Anything else?
7      A   There was some articles on the Internet
8  that said, you know, the hook from It's Your
9  Birthday was taken by 50 Cent and used as his hook
10  in the song In Da Club.
11     Q   Are you claiming Shorty, it's your
12  birthday is the hook in the song In Da Club?
13     A   It's a significant part of it.
14     Q   Not the hook?
15     A   I think it is.
16     Q   Do you think it's the hook?
17     A   Yes.
18     Q   Are there any other hooks in that song?
19     A   There may be.  There may be one but the
20  primary hook is Shorty, it's your birthday.
21     Q   Anything else?
22     A   As far as what?
23     Q   As far as evidence of substantial
24  similarity.
25     A   There are a lot of people in the industry

Page 149

1  that have told me that, you know, they're from
2  different retail accounts, one stop accounts,
3  wholesalers, people that work for Universal, people
4  who are distributors for Universal, significant
5  people that are rappers and basically you know, Mr.
6  Wong Wa's manager prior to me having a dispute with
7  him that's who.
8     Q   What people who work for Universal have
9  told you that?
10    A   There was a person that's now in charge of
11 one of your divisions that is on sick medical leave
12 and got a brain tumor just operated on, what's his
13 name, Steve Pritchitt.  He told me when he was at --
14 in the bar -- you know, I mentioned to me that I was
15 going to sue 50 Cent and stuff and he said you got a
16 substantial claim there.
17    Q   What did you say his name was?
18    A   Pritchitt. P-r-i-t-c-h-i-t-t.
19    Q   When did he tell you that?
20    A   2003 -- when I was working -- when he was
21 working for Navar.
22        You know, that was in response to me.  You
23 know, he didn't volunteer it to, I made a comment
24 that I was going to sue him and --
25    Q   At that time he was working for Navar

Page 150

1  Corporation?
2     A   Right.  You know, I wasn't really speaking
3  to him about it but ultimately, you know, I think,
4  you know, I found that he was sick and I told him,
5  you know, I e-mailed him that I'm very sorry that he
6  had brain tumor and that he's recovering.
7     Q   So you're telling me that he made a
8  statement to you, that he worked for Navar
9  Corporation, and Navar was not affiliated with
10 Universal --
11    A   They were a one-stop for Universal.
12    Q   But they're an independent company?
13    A   It's an independent publishing company.
14    Q   As far as you know there's no corporate
15 affiliation with Universal?
16    A   As far as I know, right.
17    Q   And sometime subsequent to making this
18 statement to you he began working for one of
19 Universal's businesses?
20    A   Yeah, he's in charge of Fontana, an
21 independent distributor arm of Universal.
22    Q   And since he began working for Fontana
23 he's never made another comment to you?
24    A   No.  And I don't intend to use him as a
25 witness in this case.  The man is sick.

Page 151

1     Q   Beyond him saying to you you got a
2  substantial claim there, do you recall him saying
3  anything else?
4     A   No.
5     Q   Was this set in a bar?
6     A   Yeah, we were just drinking, shooting the
7  breeze.
8     Q   And do you know how many drinks he had?
9     A   I don't know, no idea.
10    Q   How many did you have?
11    A   A couple.
12    Q   And he probably had a couple?
13    A   I'm sure we did, you know, we were at a
14 meeting and it was a meeting where he came down,
15 there were various other label people there, label
16 heads there.
17        There was like a presentation at Alliance
18 Entertainment and what brought it up was, you know
19 there was a security guard.  When we went to
20 Alliance, you know, we went to this like line where
21 you get your like name tags and she recognized me
22 from working with Luke and everything.  Then she
23 said to me, you know, you got a big case against 50
24 Cent, they stole Luke's hook in a song.  And I said,
25 yeah, a lot of other people have told me that.

Page 152

1     Q   Has anyone who works for any of the
2  defendants in this told you --
3     A   Well, the person that called me and said
4  his name was Mark.  I told you he sounded like a
5  Chinese guy.  He called me from Canne.  He said he
6  recognized that they would have to pay for this and
7  they wanted to know what I wanted and I kept telling
8  him, you know, I'm represented by Richard Wolfe, you
9  need to speak to Richard Wolfe.
10        I told him this is not like a sampling
11 claim, you know, you're talking about from what I
12 understand of all this stuff that was sold and
13 everything, you know, of I Like It, I Love It was on
14 a DVD, and I think it's different, it's infringement
15 on a DVD, and also it was the documentary that he
16 put out and the song and then he was on the main
17 album, so I think you're talking about seven figures
18 or that range without me really seeing specifically
19 what was sold and what wasn't sold.
20    Q   You told him that?
21    A   I told the guy you know, and --
22    Q   What did he say?
23    A   Well, he said, you know, you're not going
24 to get a meeting with Jim Iovini and I don't know,
25 and Jimmy's going to speak, you know, so all I said

Page 153

1 is, you know, I want to be paid for my material and
2 he said, you know, we got to pay you, we'll get back
3 to you, we're all interested in trying to resolve
4 this.
5        He called a couple of other times like we
6 never really -- he never left his number, you know,
7 all he would say was his name was Mark and he
8 sounded like Chinese --
9     Q   You mean he had a Chinese accent?
10    A   Well, you know, I think he sounded like,
11 you know, Chinese or Japanese, you know, it was like
12 his first language wasn't English --
13    Q   So he had kind of an oriental accent?
14    A   Yeah, maybe, you know, maybe he was not an
15 American more five years, tops.
16    Q   So his English was broken English?
17    A   Right.  That's what was kind of
18 distinctive to me, but he wouldn't give me a number.
19 He said he was staying at Canne at the Ritz Carlton
20 Hotel and that he would get back to me and then, you
21 know, they didn't really ever get back to me.
22        Then the newspaper reporters picked up on
23 it and they got to the court files.  You know,
24 that's it.
25    Q   You also said earlier that people were

Page 154

1 telling you that you had a claim, when was that?
2    A   I'd say in the middle of 2003.
3    Q   And you filed a lawsuit in 2006, correct?
4    A   Yes.
5    Q   Why is that?
6    A   Well, the lawyer that I had that was doing
7 my work prior to Richard, he retired so, you know, I
8 was going to file it, you know, it was the law firm
9 of Ruden McLuskey in Fort Lauderdale.
10    Q   He retired without telling you?
11    A   No, he retired.  He told me, he said, you
12 know that I should give it some thought whether or
13 not -- this is 2004 -- whether or not I wanted to
14 use him to do the case and then we had a series of
15 hurricanes in 2004, 2005 and then he retired.
16    Q   What year, 2003?
17    A   2004.
18    Q   So why didn't you file a lawsuit in 2003?
19    A   Why I didn't file it?
20    Q   Yes.
21    A   I didn't file it in 2003.
22    Q   My question is why?
23    A   I had other matters consuming my time, you
24 know, other litigation.
25    Q   What other cases were those?

Page 155

1    A   Like the World Wide Pants case and the
2 Strictly Rhythm case and the Mark Ross case, you
3 know, I don't have endless pockets, you know, to get
4 all this cash to pay to law firms.
5    Q   How many active lawsuits do you have going
6 on now?
7    A   Two, this one and the Chris Wong Wa.
8    Q   That one was filed like what, a month ago?
9    A   Within the last month.
10    Q   And in 2003 you say you were consumed with
11 other lawsuits and 2004, 2005 you had the hurricanes
12 and in 2006 you filed this lawsuit?
13    A   Well, that's when I got Richard to file
14 the case.  You know, also the Thompkins case was
15 very time consuming with discovery and depositions.
16 I had a substantial amount of review to do in that
17 case because the lawyers for that case, the
18 insurance company hired them and they weren't
19 entertainment lawyers so you know, they really
20 weren't matching up to what the legal details were.
21    Q   That's the case that is on appeal?
22    A   Yes.
23    Q   Do you contend in this lawsuit that you
24 lost licensing opportunities because of the
25 infringement?

Page 156

1    A   I don't think so other than I feel I
2 should be paid by your client --
3        MR. WOLFE:  Just answer his question.
4 BY MR. GOLDMAN:
5    Q   Other than losing income from licensing by
6 our clients --
7    A   Right.
8    Q   -- our respective clients, do you contend
9 the value of It's Your Birthday has declined?
10    A   No.
11    Q   Has it been enhanced?
12    A   Probably.
13    Q   And you're not making a claim for lost
14 profits in this case?
15    A   Not as to the composition.
16    Q   As to what?
17    A   I don't think as to either composition.
18 I think --
19        MR. WOLFE:  You answered.
20 BY MR. GOLDMAN:
21    Q   Other than the conversation with this
22 gentleman named Mark who sounds Chinese --
23    A   Chinese, Japanese.
24        MS. STETSON:  Oriental.
25        [Thereupon, a short off the record

Page 157

1   discussion was had.]
2        MR. WOLFE:  I just want to make a
3   statement for the record.
4        I have told counsel that I don't feel
5   well.  I'm starting to feel more lousy and
6   getting worse.
7        I have asked counsel to accommodate me and
8   just, you know, what I think probably is the
9   fairest thing to do, let's just push forward
10   for another forty-five minutes to an hour and
11   do the best and try to finish it.
12        If you can't finish it, we're just going
13   to have to come back.  I'm not really feeling
14   good.
15        I did think I had some time tomorrow and
16   I'd be glad to accommodate you.  I haven't been
17   sick in years but I'm doing the best I can.
18        MR. GOLDMAN:  In response, let me just say
19   very briefly, I did come all the way here from
20   Los Angeles, it was a very expensive trip and
21   it would be very difficult to come back.  I
22   appreciate the situation you're in and I'm
23   going to proceed to get done as much as I can
24   get done.  But I'm not waiving any of my
25   entitlement to seven hours and, you know, right

Page 158

1   now it's two o'clock.  My flight tomorrow
2   afternoon and maybe I'd be able to change my
3   flight to Saturday morning, but let's push
4   forward for another forty-five minutes, see
5   what we can accomplish and maybe we'll have to
6   come back tomorrow.
7   BY MR. GOLDMAN:
8        Q   Let me ask you this, have you ever heard
9   of Uncle A?
10        A   Yes.
11        Q   Who is Uncle A?
12        A   Uncle A is dead.
13        Q   Who is Uncle A?
14        A   He's an artist signed to my label, Albert
15   Moss.
16        Q   Did he have a radio show?
17        A   Yes.
18        Q   When was that show aired?
19        A   1999, 2000.
20        Q   What was the nature of your relationship
21   with Uncle A?
22        A   He was an artist signed to my label.
23        Q   Was he affiliated with a company called
24   Liberty Records?
25        A   Liberty Records was a label in print that

Page 159

1   I gave him when he signed with me.
2        Q   So it was owned by you?
3        A   It was Liberty City Records.  It was used
4   to identify recording artists, you know, only his
5   recordings.
6        You know, what he did is he wanted to get
7   some local artists to do different tracks with him
8   and that was going to be his album.  He wanted to
9   like introduce, you know, other artists that were
10   going to come off of his imprint.
11        Around the time that he got done with the
12   album, he got killed, you know, someone came into
13   his house and killed him because they believed that
14   he had stolen a radio transmitter.  That person just
15   got caught recently.
16        Q   Was it a rap performer?
17        A   Yes.
18        Q   Are you aware of him ever using the term
19   "go blank, it's your birthday?"
20        A   No, I'm not aware of.
21        Q   Do you recall ever seeing an advertisement
22   for the Kentucky Fried Chicken Corporation that used
23   the term "go Colonel, it's your birthday?"
24        A   No.
25        Q   Have you looked at the lyrics for the 50

Page 160

1   Cent song that you said was infringed on in this
2   lawsuit?
3        A   There's only one song of him, because the
4   portion that he does say I like it, I love it, it's
5   just a clip in the documentary where he does a DVD.
6   There's no song -- it's a piece of a concert footage
7   that is repeated several times on the documentary.
8   It's different from the concert.  It's not part of
9   the song it's just something he did in the concert
10   with a recording to a DVD.
11        Q   So in other words, there are no lyrics to
12   that because it's not a song?
13        A   Right.  I have not found it in an
14   independent song, I Like It, I Love It by 50 cent.
15        Q   Are their lyrics to In Da Club?
16        A   I have looked at them, yes.
17        Q   You're familiar with them?
18        A   Not overly familiar with them.  I printed
19   them out.
20        Q   Do you find them offensive?
21        A   No, I don't find any material offensive,
22   any of this.
23        Q   I take it you're not making a contention
24   that any nature of the lyrics of 50 Cent song form
25   any part of your damages?

Page 161

```
 1    A   No, I don't think so.  I have to check.
 2    Q   How have you been damaged by this?
 3    A   I wasn't paid for my copyrights.
 4    Q   A reasonable license fee?
 5    A   A reasonable license fee.
 6    Q   Do you have an opinion what a reasonable
 7 license fee with be for for this?
 8        MR. WOLFE:  I'm going to object to this
 9    whole line of questioning.  That is not what
10    the remedy is in a copyright statute or what it
11    provides.
12        You're going to the theoretical area here
13    that does not necessarily set forth what the
14    measure of damages are and the claims are set
15    forth in the Complaint.
16        MR. GOLDMAN:  In the interest of time I'm
17    to mark a few licenses collectively as one
18    exhibit and we'll go through them a little bit
19    more quickly that way.
20        I'm not purporting that this is an
21    exhaustive collection of all the licenses, but
22    it's for some I guess, some of the ones that I
23    pulled out.
24        [Thereupon, the aforementioned documents
25    were marked as Defendant's Exhibit No. 10 for
```

Page 162

```
 1 Identification.]
 2 BY MR. GOLDMAN:
 3    Q   These four documents represent four
 4 licenses.  The first one is for a Jamie Foxx Show.
 5 Do you recall what was used?
 6    A   It's attached to one of the documents.  I
 7 think it's called Mr. Bojangles.
 8        It's got your birthday stuff here.
 9        If you see it here, it sees, singing it's
10 your birthday, go fancy, sales director, at the
11 hotel, I'm getting tired, and they're playing the
12 music from it's your birthday, they're playing, you
13 know, the music on the stereo.
14    Q   And the payment was $6,000 for each?
15    A   Right.
16    Q   This is a total of $12,000?
17    A   Yeah, I think so, plus there are some
18 options in there for DVD sales and future stuff like
19 that.
20    Q   So you got $12,000 for that use?
21    A   Yes.
22    Q   The next license here is for Chasing Amy,
23 I believe that's a movie?
24    A   Yes.
25    Q   What was the use there?
```

Page 163

```
 1    A   Well, it describes in there, visual vocal
 2 approximately 10 seconds and then they play the rest
 3 of it in the background of the song.
 4    Q   Do you know what lyrics were used?
 5    A   Almost the whole song.
 6    Q   I see, for two minutes and thirty-one
 7 seconds it's being played, prominently for ten
 8 seconds and then the rest of it in the background
 9 for two minutes and forty-one seconds?
10    A   Right.
11    Q   That's It's Your Birthday?
12    A   Right.
13    Q   So the use of that song, for the use of
14 that song you received $5,000?
15    A   Ten, it was five and five.
16    Q   So $5,000 for Lil' Joe Wein Music, Inc.,
17 and $5,000 for Little Joe Records and a total of
18 10,000?
19    A   Yes.
20    Q   The next one here is, let me see, it's
21 Uncle P, It's Your Birthday, and that was for a fee
22 of $3,000?
23    A   Yes.
24    Q   And that was for the use of 15 seconds of
25 the song?
```

Page 164

```
 1    A   Yes.
 2    Q   And for the lines go blank it's your
 3 birthday?
 4    A   Right.
 5    Q   And the first -- the next license here
 6 which would be number four is for the use of MTV
 7 programming, My Supersweet 16 for $750?
 8    A   Yes.
 9    Q   What type of use was that?
10    A   $750 -- you know, whatever it says, I
11 don't remember.
12    Q   You don't recall?
13    A   No.
14    Q   Are you familiar with this program, My
15 Supersweet 16?
16    A   No.
17    Q   You don't like MTV?
18    A   I don't recall that program.  I watch MTV,
19 but I don't recall it.  Usually, you know, for MTV,
20 when they ask for something, whatever they want to
21 pay me, I take.  I'm not going to prevent them from
22 using something.
23    Q   Do you watch MTV?
24    A   Yes.
25    Q   Did you watch it when you were employed by
```

Page 165

1  Luther Campbell?
2      A   Sure.
3      Q   Frequently?
4      A   Sure.
5      Q   Are you pretty familiar with the
6  programming?
7      A   I watched a lot of video shows, like Video
8  Jukebox which was owned by MTV.
9      Q   Have you ever received more than $12,000
10  for a license for It's Your Birthday?
11      A   I don't think so, I don't think so.
12          That's other than the existing licenses on
13  songs that are being used on compilation albums.
14      Q   That would be where the entire song is
15  used, not just a sample or a clip or an
16  interpolation?
17      A   Yes.
18      Q   And all the uses involved uses of a
19  recording, all the ones on this exhibit?
20      A   Uncle P did not, Sweet 16 did not.
21      Q   Sweet 16 was a re-record?
22      A   I think it was just the lyrics.  The
23  license was only with lyrics.
24      Q   You don't know what lyrics that was?
25      A   I believe it was go, go, go, so and so,

Page 166

1  it's your birthday.  I think it was same naming
2  of -- I think it was somebody else it's your
3  birthday.   And I think Jamie Foxx just did, you
4  know, it off the melody line.
5      Q   And also I think there was something from
6  the Tom Joyner Show that I don't see, Evan Greenspan
7  music thing.
8          Let me see if I can find that.  This is
9  the only copy I have.  We'll mark it as Exhibit 11.
10          [Thereupon, the aforementioned document
11  was marked as Defendant's Exhibit No. 11 for
12  Identification.]
13  BY MR. GOLDMAN:
14      Q   Is No. 11 what you're referring to?
15      A   Yes.
16      Q   What license is this?
17      A   This was for the Tom Joyner Show and the
18  amount of it, 30 seconds of it.
19      Q   And what was the license fee?
20      A   It was $500.  It was based upon his
21  prominent name, that's what he paid.
22      Q   So of all the licenses, six licenses, if
23  you will, for It's Your Birthday they ranged from
24  $500 to $12,000?
25      A   Yes, you know, with options for DVD which

Page 167

1  I think is like that.
2      Q   Do you know who M&M is?
3      A   Yes.
4      Q   He's a big star?
5      A   I would think so.
6      Q   Is he one of the biggest stars in the
7  world?
8      A   At one time he was.  I wouldn't say he is
9  now.
10      Q   But he was one of the biggest stars in the
11  world?
12      A   Probably.
13      Q   Do you know who Dr. Dre is?
14      A   Yes.
15      Q   Is he a huge name in the industry?
16      A   Sure is.
17      Q   A legend?
18      A   That's what they say.
19      Q   Are you aware that Dr. Dre and M&M were
20  both closely associated with 50 Cent when the album,
21  Get Rich Or Try Dyin' was released?
22      A   Sure.
23      Q   Would you agree with the affiliation with
24  50 Cent and M&M and Dr. Dre would help 50 Cent sell
25  a lot of records?

Page 168

1      A   What do you mean by a lot?
2      Q   Did they contribute significantly to the
3  sales of Get Rich Or Try Dyin'?
4      A   In part.
5      Q   Well, not for all the sales but they
6  contributed significantly?
7      A   The only thing I can say, and I don't want
8  to debate with you about that, but the word
9  significant I don't believe is a correct thing to
10  state.  I'm not in agreement with the word
11  significant other than I am agreeable that they
12  probably helped.
13      Q   Are you saying that there was a
14  contribution by the connection of M&M and Dr. Dre
15  for the sales and distribution of 50 Cent?
16      A   I'm saying -- I'm not conceding that it
17  was significant, I'm saying it was a factor.
18      Q   A major factor?
19      A   I'm not, I think it was a factor.
20      Q   Would you give me that it was an important
21  factor?
22      A   No, I wouldn't do that.
23      Q   It was a factor?
24      A   A factor, a factor of many.
25      Q   But it was more than an insignificant

Page 169

1  factor?
2      A   I don't know about that.
3      Q   Well, you wouldn't say it was an
4  insignificant, because people would have paid
5  attention to the material originally because it was
6  affiliated with Dr. Dre and M&M?
7      A   I wouldn't say because of that, you know,
8  you know.
9          You know, I wouldn't say that because
10  that's why these things do what they do, you know,
11  like Tony Ya Ya was not as big as M&M and Dr. Dre
12  and 50 Cent, so that kind of pops the balloon on
13  you.
14      Q   Have you heard the movie 8-Mile?
15      A   Yes.
16      Q   That was a very popular movie, was it not?
17      A   Yes.
18      Q   And the soundtrack was very popular on
19  8-Mile?
20      A   Yes.
21      Q   Are you aware that the song Wangster was
22  done by 50 Cent on that soundtrack was a huge hit?
23      A   Yeah.
24      Q   And that came out before Get Rich Or Die
25  Trying?

Page 170

1      A   No, afterwards.
2      Q   That was after the album was released?
3      A   Yes.
4      Q   Are you sure of that?
5      A   I'm 99 percent sure.
6      Q   Well, take me for that one percent
7  possibility that you're wrong --
8      A   Well, I was aware of Wangster after Get
9  Rich Or Die Tryin'.
10          I'm not saying it's entirely, but it
11  didn't proceed but I became aware of Wangster
12  afterwards.  I can't tell you when I became aware of
13  Wangster but close to in a year of that time.
14      Q   Have you listened to Get Rich or Die
15  Tryin's album?
16      A   Yes.
17      Q   Many times?
18      A   Yes, it's one of my favorite albums.
19      Q   Is the production by Dr. Dre on the album
20  distinctive?
21      A   Sure.
22      Q   And does Dr. Dre's production of the album
23  contribute or factor into album sales?
24      A   Yes.
25      Q   Is the performance of 50 Cent on the album

Page 171

1  a contributing factor to the album's sales?
2      A   Yes.
3      Q   Are you familiar with Interscope Records?
4      A   Yes.
5      Q   They are a prominent recording company in
6  the business?
7      A   Yes.
8      Q   All right.  Do know who Steven Berman is?
9      A   I know who he is.  I know the name.
10      Q   Who is Steven Berman?
11      A   I knew the name, I don't know specifically
12  right now what he does, but I know what the name is.
13      Q   Is Interscope generally one of the best at
14  marketing albums?
15      A   Yes.
16      Q   Is Interscope's marketing staff able to
17  contribute to the sales of albums in a way perhaps
18  other marketing staffs wouldn't be, is that fair?
19      A   If you have the material to work with, so
20  if you have quality material and you have quality
21  people to market it, then you're going to hit.
22      Q   Do you think the way Interscope marketed
23  this album was effective?
24      A   I'm sure, yes.
25          I wouldn't have any criticism to the way

Page 172

1  they did.
2      Q   And does that also contribute to album
3  sales?
4      A   I already said that.
5      Q   Before this album was released did 50 Cent
6  already have a lot of buzz about him?
7      A   Yeah, there was a lot of controversy
8  between him and Supreme and Naz and the New York
9  stuff, you know, with Gyro, yeah, there was already
10  a lot of talk about 50 Cent.
11      Q   Before the album came out?
12      A   Yeah, the J-Master stuff.
13      Q   That all contributed to the buzz?
14      A   Yeah, those were all factors.
15      Q   Do you have an opinion based upon your
16  experience in the music industry what percentage of
17  the profits of the Get Rich Or Die Tryin' album is
18  attributable to the alleged infringement in this
19  case?
20      A   I don't know what the profits were, I'd
21  have to see what the profits were and then -- that's
22  why I hired an expert, you know, because they've got
23  a lot more experience than I do.
24          I would confer with my expert and Mr.
25  Wolfe who have a lot more experience in trying to

Page 173

1  come up with some kind of figure.
2      Q   I understand that you would so all that,
3  and you're certainly entitled to do that.
4          But my question is a little bit different.
5          Apart from your expert and apart from Mr
6  Wolfe and anybody else, based upon your experience
7  and expertise in the music industry and in the
8  marketing of records, do you have an opinion as to
9  the percentage of profits from Get Rich Or Die
10 Tryin'?
11         MR. WOLFE:  I'm going to interpose an
12 objection, we have not received your production
13 and perhaps, you know, after he sees your
14 production he'll be able to formulate an
15 opinion --
16         THE WITNESS:  I would have to guess.  I
17 need to see the different materials.
18         MR. GOLDMAN:  Okay.
19         THE WITNESS:  But in my opinion, twenty
20 years of experience in the business, from I've
21 paid for samples up front, you know, and what I
22 think about paying when I'm contemplating a
23 deal, we just had a clearance on a sample just
24 recently that was in my opinion less
25 significant than what was done by 50 Cent and

Page 174

1  Universal quoted him a six cent per usage
2  charge of the master and a $6,000 advance for
3  the sample on an RB group that this guy was
4  paying out.
5  BY MR. GOLDMAN:
6      Q   Was that for the musical composition only,
7  for the sound recording --
8      A   For the musical composition.
9      Q   So a $6,000 recuperable advance --
10     A   $6,000 nonrecuperable at six cents a unit.
11     Q   What was the song?
12     A   I don't recall but if Richard doesn't have
13 a problem I can have somebody from office fax it
14 over to me --
15         MR. WOLFE:  I don't even know what the
16 relevance is.
17         THE WITNESS:  I don't know.
18         MR. WOLFE:  I'm not in a position to make
19 an objection if you want to give it to him but
20 I don't know how relevant it is, I'm just going
21 to make an objection.
22         MR. GOLDMAN:  Well, when we take a break
23 in the deposition maybe he can get it.
24         [Thereupon, a short off the record
25 discussion was had.]

Page 175

1  BY MR. GOLDMAN:
2      Q   Other than the lawsuits that you have
3  filed, are there any other copyright claims that you
4  have pursued that have not resulted in litigation or
5  that have been settled?
6      A   Yes.
7      Q   How many of those would you say have
8  occurred?
9      A   A couple.
10     Q   Can you identify them?
11     A   One was against Dr. Dre and M&M himself.
12     Q   Which one was that?
13     A   A song that M&M did called Guilty
14 Conscience.  And the song that he took the recording
15 was Hoochie Mama from 2-Live Crew and that also
16 involved a license fee.
17         That was a flat fee payment, I think.
18     Q   When was that resolved?
19     A   Close to the time that M&M's album came
20 out, you know, the beginning of that time.
21     Q   Which album?
22     A   His very big album, his first album.  I
23 don't know what the name of it was, I think Slim
24 Shade.
25     Q   And you said that there was another one

Page 176

1  that you could think of that there was a claim that
2  you had resolved?
3      A   A claim against Luke, I think it was back
4  in '96, we got a payment for a record on Island
5  Records and Michael Seltzer.
6      Q   And do you have a current claim against
7  Luke that you haven't sued on yet?
8      A   I do -- I can't think of any.
9      Q   You mentioned earlier that after the
10 bankruptcy in 1995 you entered into a separate
11 agreement with the various writers with respect to
12 your copyright interest, is that accurate?
13     A   I don't think I ever said that to you.
14     Q   Was there separate litigation with the
15 writers after the bankruptcy involving securing the
16 rights to songs?
17     A   No, which writers are you talking about?
18     Q   Well, Christopher Wong Wa?
19     A   There was litigation, no, not with him.
20     Q   How about David Hobbs and Mark Ross?
21     A   David Hobbs, there was litigation with him
22 because he stopped doing what he was doing.
23     Q   What was he doing?
24     A   Well, he left the 2-Live Crew and he was
25 out there performing as 2-Live Crew.

Page 177

1   Q   So that was a trademark issue?
2   A   Yes.
3   Q   What about Mark Ross?
4   A   Mark Ross was doing the same thing with
5   him, performing as 2-Live Crew. So I sued Mark Ross
6   and he went bankrupt. Then I kind of realized what
7   he, you know, he and David Hobbs were trying to do
8   so I stopped Mark Ross from performing as 2-Live
9   Crew.
10   Q   What about Chris Wong Wa?
11   A   I had litigation with him several years
12   ago and came to a resolution with him.
13       I gave him a license to do live
14   performances only.
15       Michael Stirling, you client and I tried
16   to get him involved in a project involved with David
17   Hobbs and Mark Ross and Mr. Wong Wa wanted to
18   continue performing as a separate 2-Live Crew versus
19   the new materials with the original members of
20   2-Live Crew and it just was not going to work and
21   it became, you know, there was a discussion that
22   lasted a year or so. I did an investigation and it
23   appeared that Mr. Wong Wa acknowledged that he did
24   defraud me as to a license fee that he was supposed
25   to pay me for live performances and that's what that

Page 178

1   litigation was about.
2   Q   Are you familiar with a song called
3   Birthday Jam?
4   A   No, never heard that song.
5   Q   Birthday Jam?
6   A   No.
7   Q   And Birthday Jam, is it your understanding
8   Chris Wong Wa was the author of a song Birthday Jam?
9   A   Christopher Wong Wa told Michael Stirling
10   that he was not going to be working with us that he
11   was going to say that Luke stole It's Your Birthday
12   song from him. He didn't mention the name of the
13   song to Michael but he did mention to Michael
14   Stirling that, but he did not mention it to me.
15       The particular song I didn't know,
16   Michael, you know, advised me of that, he said, you
17   know, you better watch out there's going to be a
18   lawsuit that Christopher Wong Wa is going to come up
19   with that the position he's going to take is Luke
20   stole It's Your Birthday song from him and then I
21   told Mr. Wolfe about that.
22   Q   Is that the extent of your knowledge of
23   Christopher Wong Wa's authorship of Birthday Jam?
24   A   I don't know what song he did, you know.
25   I did look on the Internet for any song that he had

Page 179

1   done other than the material that I own and I didn't
2   see any song that had birthday in it.
3       I thought it, you know -- I kind of
4   thought it was a little blunder or bluster.
5       He also told Michael Stirling that he was
6   going to contact 50 Cent to get paid by 50 Cent to
7   sabotage my lawsuit.
8   Q   That was Christopher Wong Wa when he told
9   Michael Stirling who told that to you?
10   A   Yes.
11   Q   Christopher Wong Wa never told you that
12   directly?
13   A   No, he did not.
14   Q   And what copyrights were involved with
15   Jerry Springer?
16   A   The copyrights involved there were really
17   ones by Mark Ross and Christopher Wong Wa and one by
18   Luke for a performance that he did especially for a
19   movie called Living In America.
20   Q   What was the nature of the used by the
21   Jerry Springer Show that you objected to?
22   A   Well, that I was the fraud -- I was told
23   that Jerry Springer and DVD were going to be used on
24   a video that I had paid several hundred thousand
25   dollars to do and, you know, for bonuses and things

Page 180

1   on the DVD and I thought I was going to be able to
2   market the current 2-Live Crew album that I had out
3   because of that and it turned out he used some new
4   artist.
5   Q   And was the Strictly Rhythm lawsuit about?
6   A   That was about the song Shake What Your
7   Mamma Gave You by Poisson Clan.
8   Q   What was the nature of that use?
9   A   Sampling.
10   Q   Of what?
11   A   Shake What Your Mamma Gave You song.
12   Q   What was the MTV lawsuit about?
13   A   MTV lawsuit?
14   Q   Was there an MTV lawsuit?
15   A   I may have sued MTV. I think maybe
16   Viacom, Viacom owns MTV, right?
17       I think I sued them in 2001, maybe.
18   Q   Do you recall what that was about?
19   A   They used a bunch of different videos,
20   different programming without paying for them.
21   That's what I remember. There were a lot of
22   different videos.
23   Q   That were made in the early '90s?
24   A   Yeah.
25   Q   These were music videos that you're

45 (Pages 177 to 180)

Page 181

1  talking about?
2      A  I think so.
3         [Thereupon, a short off the record
4  discussion was had.]
5  BY MR. GOLDMAN:
6      Q  Back on the record.
7         Do you have an opinion as to what portion
8  of the sales of the DVD, The New Breed were
9  attributable to the alleged infringement?
10     A  No.
11     MR. GOLDMAN:  Ordinarily I would take
12 about ten minutes and go through my notes, and
13 all of my documents, to see if I have any more
14 questions.  But since clearly we need to leave,
15 why don't we just -- I don't want to say I'm
16 going to end the deposition but at this point I
17 don't have any more questions.  I'm going to
18 read my notes and hopefully I won't have to
19 resume this but if we do maybe we can do it
20 telephonically.
21     MR. WOLFE:  I appreciate that, I really
22 don't feel well.
23     MR. GOLDMAN:  I'm not going to say that I
24 have two more hours, but ordinarily I would
25 take more time to go over my notes.  Maybe we

Page 182

1  can do it telephonically --
2      MR. WOLFE:  Any way we can accommodate you
3  I appreciate you're wrapping it up.
4         [Thereupon, the deposition was concluded
5  at 3:45 p.m., formalities were not waived.]
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 183

JURAT PAGE

STATE OF FLORIDA ) SS.
COUNTY OF DADE   )

    I, JAY WEINBERGER, hereby certify that I have
read the foregoing transcript, and find the same to
be true and accurate.

            FURTHER DEPONENT SAITH NOT

    . . . _____

            DEPONENT

    Sworn to and subscribed before me

this_____day of_____, 2006.

            _____

            NOTARY PUBLIC

    My Commission Expires:

Page 184

STATE OF FLORIDA     )
                     ss.
COUNTY OF MIAMI-DADE )
    I, Ira E. Cohen, Court Reporter, do hereby
certify:
        That prior to being examined, the witness
in the foregoing proceedings was by me duly sworn to
testify to the truth, the whole truth, and nothing
but the truth;
        That said proceedings were taken before me
at the time and place therein set forth and were
taken down by me in shorthand and thereafter
transcribed into typewriting under my direction and
supervision;
        I further certify that I am neither
counsel for, nor related to, any party to said
proceedings, nor in anywise interested in the
outcome thereof.
        In witness whereof, I have hereunto,
subscribed my name.
        Dated this_____day of_____, 2006.

        _____
        Ira E. Cohen
        Commission No._____
        My Commission Expires:_____

Page 185

ERRATA SHEET

PURSUANT TO RULE 1.310 (e) of the Florida Rules of Civil Procedure, this deposition is being submitted to you for examination, reading and signing. Please DO NOT WRITE on the transcript. Any changes in form of substance you desire to make should be entered upon this sheet as follows:

PAGE NO.

LINE NO. :        CHANGE :        REASON :

DATE:

ADDRESS:

COUNTY OF:                        JAY WEINBERGER

Notary Public, State of Florida at Large

My Commission Expires:

Page 186

KLEIN-BURY AND ASSOCIATES, INC.
One Southeast Third Avenue, Suite 1250
Miami, Florida 33131
Registered Professional Reporters
DADE: (305) 373-8404

August 24th, 2006
Mr. Joe Weinberger
C/O Richard Wolfe, Esq.
Wolfe & Goldstein
100 Southeast Second Avenue
Suite 3300
Miami, Florida

Re: Wein Music vs. Curtis James Junction City, et al.

Dear Mr. Weinberger:

    Please take notice that on the 17th day of August, 2006, you gave your deposition in the above-referred to matter. At that time, you did not waive your signature. It is now necessary that you sign your deposition. Please call our office between the hours of 9:00 a.m. and 4:00 p.m. to make arrangements to read your deposition.

    If you do not appear to sign your deposition within 10 days of the date of this letter, the original will be forwarded to the attorney who requested your appearance for the deposition for filing with the Clerk of the Court. If you wish to waive your signature, sign your name in the blank at the bottom of this page and return it to us.

                Very truly yours,
                KLEIN, BURY & ASSOCIATES, INC.

                Notary Public

I DO HEREBY WAIVE MY SIGNATURE

JAY WEINBERGER
cc: All Attorneys of Record
cc: Court Copy

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. *06-20079-CIV-Huck*

☐ **DUE TO POOR QUALITY, THE ATTACHED DOCUMENT IS NOT SCANNED**

---

# ATTACHMENT(S) NOT SCANNED

☐ VOLUMINOUS (exceeds 999 pages = 4 inches)
☐ BOUND EXTRADITION PAPERS
☐ ADMINISTRATIVE RECORD (Social Security)
☐ ORIGINAL BANKRUPTCY TRANSCRIPT
☐ STATE COURT RECORD (Habeas Cases)
☐ SOUTHERN DISTRICT TRANSCRIPTS
☐ LEGAL SIZE
☑ DOUBLE SIDED
☑ PHOTOGRAPHS
☐ POOR QUALITY (e.g. light print, dark print, etc.)
☐ SURETY BOND (original or letter of undertaking)
☑ CD's, DVD's, VHS Tapes, Cassette Tapes
☐ OTHER = _____

# PLEASE REFER TO COURT FILE